UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITILINE HOLDINGS, INC., Individually and On Behalf of All Others Similarly Situated, | Civil Action No. 1:08-cv-03612-RWS **(Consolidated)** |
| Plaintiff, | CLASS ACTION |
| vs. | |
| ISTAR FINANCIAL INC., et al., | |
| Defendants. | |

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

Plaintiffs Plumbers Union Local No. 12 Pension Fund and Citiline Holdings, Inc. ("Lead Plaintiffs" or "Plaintiffs") make the following allegations, except as to allegations specifically pertaining to Plaintiffs and Plaintiffs' counsel, based upon the investigation undertaken by Plaintiffs' counsel, which investigation included analysis of publicly available news articles and reports, public filings, securities analysts' reports and advisories about iStar Financial Inc. ("iStar" or the "Company"), interviews of former iStar employees, interviews of people knowledgeable about iStar's business and investments, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of a class consisting of all persons, other than Defendants, who purchased the common stock of iStar between December 6, 2007 and March 6, 2008 (the "Class Period"), against iStar, certain of its officers and directors and the Underwriter Defendants, as defined below, for violations of the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o] and Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

3. This Court has jurisdiction of this action pursuant to Section 22 of the Securities Act [15 U.S.C. §77v], Section 27 of the Exchange Act and 28 U.S.C. §1331.

4. Venue is properly laid in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act and 28 U.S.C. §1391(b) and (c). iStar maintains its executive

offices in this District and the acts and conduct complained of herein occurred in substantial part in this District.

5. In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the New York Stock Exchange (the "NYSE"), a national securities exchange.

**PARTIES**

6. Lead Plaintiffs purchased iStar common stock, as set forth in their certifications previously filed in this case and incorporated herein by reference, during the Class Period, and were damaged thereby.

7. Defendant iStar is a finance company whose lending business primarily consists of making senior and mezzanine loans on commercial real estate. The Company's executive offices are located at 1114 Avenue of the Americas, 39th Floor, New York, NY 10036.

8. Defendant Jay Sugarman ("Sugarman") was, at all relevant times, iStar's Chairman of the Board of Directors, Chief Executive Officer and Investment Committee member. Defendant Sugarman signed the Registration Statement issued in connection with the Secondary Offering.

9. Defendant Nicholas A. Radesca ("Radesca") was, at all relevant times, iStar's Chief Accounting Officer ("CAO"). On the last day of the Class Period, iStar announced that Defendant Radesca resigned from his position as CAO, effective February 29, 2008. Defendant Radesca signed the Registration Statement.

10. Defendant Catherine D. Rice ("Rice") was, at all relevant times, iStar's Chief Financial Officer ("CFO"). In addition to serving as iStar's CFO, Defendant Rice assumed Defendant Radesca's duties upon his resignation. Defendant Rice signed the Registration Statement.

11. Defendant Timothy J. O'Connor ("O'Conner") was, at all relevant times, iStar's Chief Operating Officer ("COO") and Executive Vice President. As COO, Defendant O'Conner was responsible for developing and managing the Company's risk management and due diligence operations, which included evaluating and approving new investments and coordinating information systems.

12. Defendants Sugarman, Rice, Radesca and O'Conner are referred to herein as the "Individual Defendants."

13. Defendants Citigroup Global Markets Inc. ("Citigroup"), J.P. Morgan Securities Inc., ("Morgan"), Wachovia Capital Markets, LLC ("Wachovia"), Banc of America Securities LLC, ("B of A"), Deutsche Bank Securities Inc. ("Deutsche Bank") and UBS Securities LLC ("UBS") are investment banks that served as underwriters for the Secondary Offering. Defendants Citigroup, Morgan, Wachovia, B of A, Deutsche Bank and UBS are collectively referred to herein as the "Underwriter Defendants."

## CLASS ACTION ALLEGATIONS

14. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of themselves and all persons who purchased the common stock during the Class Period. Excluded from the Class are Defendants, members of Defendants' immediate families, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

15. The members of the Class are so numerous that joinder of all members is impracticable. iStar sold 8 million common shares in the Secondary Offering and approximately 134 million of its common shares were outstanding during the Class Period. The precise number of

Class members is unknown to Plaintiffs at this time but is believed to be in the tens of thousands. In addition, the names and addresses of the Class members can be ascertained from the books and records of iStar or its transfer agent or the underwriters to the Secondary Offering. Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

16. Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intend to prosecute this action vigorously.

17. Plaintiffs' claims are typical of the claims of the other members of the Class because Plaintiffs and all the Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants. Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

18. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

19. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether the Registration Statement issued by Defendants to the investing public in connection with the Secondary Offering omitted and/or misrepresented material facts about iStar and its business;

(c) whether Defendants' statements issued during the Class Period were materially false and misleading; and

(d) the extent of injuries sustained by members of the Class and the appropriate measure of damages.

**SUBSTANTIVE ALLEGATIONS**

**The Company and Its Business**

20. Defendant iStar describes itself as a leading publicly-traded finance company focused on the commercial real estate industry. The Company, which is taxed as a real estate investment trust ("REIT"), purports to provide custom-tailored financing to high-end private and corporate owners of real estate, including senior and mezzanine real estate debt, senior and mezzanine corporate capital, corporate net lease financing and equity. Generally, senior debt or equity investments possess a first priority position in the underlying assets and are less risky than mezzanine debt or equity investments whose interest in the underlying assets are subordinated to the senior debt or equity investor. As of December 31, 2007, first mortgage/senior loans and mezzanine/subordinated debt respectively represented 85% and 11% of iStar's loan portfolio.

21. iStar's two primary lines of business are lending and corporate tenant leasing. The lending business consists primarily of senior and mezzanine real estate loans that typically range in size from $20 million to $150 million with maturities generally ranging from three to ten years. The

Company's corporate tenant leasing business provides capital to corporations and others who control facilities leased primarily to single customers.

22. By early 2007, conditions in the U.S. mortgage market had begun to deteriorate significantly due to several factors. The Federal Reserve began raising interest rates, which climbed steadily from 4% in mid 2004 to 8.25% in September 2007. As key short-term and the prime rates rose, other interest rates rose as well, including those for most mortgage loans. This rise in interest rates dampened the demand for mortgage loans as the increase in the cost of financing reduced the expected rate of return on real property ownership. Also, and not coincident with the rise in interest rates, real property appreciation began to slow in 2006, and the overall economy began to cool. This combination of factors drove down the value of mortgage loans that lenders, such as iStar, carried on their books and increased the risk associated with the U.S. mortgage lending.

23. This increase risk represented a distinct challenge to lenders structured as REITs, like iStar. Since REITs are required to return much of their cash to shareholders pursuant to federal tax laws, iStar and other REIT lenders must have ready access to capital in order to possess the liquidity necessary to issue mortgage loans.

24. On July 2, 2007, iStar acquired the $6.27 billion commercial real estate loan portfolio and commercial real estate lending business from Fremont Investment & Loan ("Fremont"), a subsidiary of Fremont General Corporation, pursuant to a definitive asset purchase agreement dated May 21, 2007.

25. As a result of the acquisition, iStar acquired approximately 285 commercial first mortgage loans from Fremont. Approximately 60% of the value of the loans, as of March 31, 2007, were collateralized by apartment and other types of residential properties located throughout the United States. The balance of the loans were collateralized by a variety of property types.

26. The aggregate principal amount of the loans that the Company acquired was approximately $6.5 billion as of March 31, 2007, and approximately 130 employees of Fremont joined the Company upon the closing of the transaction.

27. As consideration for the acquisition, iStar paid Fremont approximately $1.9 billion in cash and transferred to Fremont a senior A-participation interest in the acquired portfolio of loan assets representing an approximately 70% interest in the portfolio. iStar retained a 30% B-participation interest in the acquired portfolio of loan assets with an approximate $2.1 billion principal amount.

28. To finance the Fremont acquisition, iStar obtained a $2 billion bridge facility, which was scheduled to mature in June 2008. In addition, iStar agreed to fund up to approximately $4.4 billion of unfunded loan commitments associated with the acquired portfolio.

**The Investor Conference**

29. On December 6, 2007, iStar held its 2007 Investors Day Conference at the New York Public Library (the "Investor Conference"). At the Investor Conference, iStar and its management made presentations to the investment community concerning the Company's balance sheet and investments, among other things.

30. During the Investor Conference, Defendants portrayed iStar as "conservative" and told investors, among other things, that "the strength of our [iStar's] balance sheet has always been one of the strong holds of the iStar story." Defendants represented that iStar regularly reviewed its loan portfolio with a "bias towards relative conservatism with respect to values" and that the Company has "135 people that all they do from the time they get up to the time they leave work is to watch our portfolio and our assets."

31. During the Investor Conference, Defendants also spoke about the Company's non-performing loan ("NPL") portfolio and high risk loans. Defendants told investors that they "flag

internally" NPLs and that they "are talking about [them] every week." Defendants also represented that they maintained adequate reserves for loan losses and that their loan loss reserving practices were conservative.

**Defendants Minimize iStar's Risks as Compared to Other Mortgage Lenders**

32. During the Investor Conference, Defendants distinguished the business risks facing iStar from those facing other mortgage lenders by positively describing iStar's business model so that the marketplace would continue to supply it with the necessary liquidity during the height of the U.S. sub-prime mortgage and financial crisis. For example, during the Investor Conference, Defendant Sugarman highlighted iStar's "balance sheet strength," stating, in pertinent part:

> I guess it's fair to say it's been a very interesting year to date, and one we like to sum up as, "Be careful what you wish for." As many of you have heard me say many times before, we've been very surprised and disappointed with the relative ease at which new finance companies in our space have been able to access extraordinary levels of leverage based on we thought business plans that were far inferior to the iStar enterprise.
>
> As you'll hear later today, we've spent a lot of time trying to craft our business strategies to stay away from that capital, and I think what we hope was a correction in the credit and finance markets would really demonstrate the flexibility**, the balance sheet strength** and the opportunities embedded in having an unsecured, investment-grade model**.**
>
> Now, this slide [*infra*], which you're going to see a couple of times today, highlights the conservative level of leverage that we see in almost all corporate ratings of real estate finance companies, and we like to compare that with the very aggressive levels of leverage we have seen in the structured credit market over the past couple years. And as we've pointed out in many presentations, what's really striking is the relative value, represented by bonds issued out of this corporate family, compared to this slice of the structured credit market, despite similar ratings, BBB, BAA2, in our case.
>
> And I want to do some quick comparisons for you. We're going to come back to this slide a couple of times, but **it's important to start with the strength of this business model. So I guess I picked iStar Financial**. Obviously, we have a viewpoint on our own credit, but I think you'll see this comparison works in a lot of other companies' case, as well.

When you're buying bonds in the iStar enterprise, you're buying a $15 billion unencumbered asset pool across multiple assets, originated in multiple years, in multiple parts of the commercial real estate world. This is a very strong sponsored CDO. It's one of probably the best in the business. It was issued in 2006. It has about $1 billion of assets, so a fraction of the size.

Almost all of the assets are originated at the same time, and, candidly, the top 10 assets in that pool, it's a 30-asset pool, represent 52% of the balance of that entire $1 billion capital stack. So we've got a very concentrated portfolio.

This portfolio, again, much more diversified, top 10 assets about 12%. That's over $3 billion of tangible equity sitting underneath, protecting those bondholders. Over here, you've got a little over $100 million.

And, lastly, this enterprise runs with significantly lower leverage than the investment grade leverage over here. **And I point this out simply to start the meeting by saying the strength of our balance sheet has always been one of the strongholds of the iStar story.**




*   *   *

So given that environment, what I thought I would do to kick off the meeting is really highlight the good news, and then perhaps some of the things that are more challenging. **And we've put together a slide here where we can go through some of the things that I think really differentiate the iStar model** [*infra*].

One, obviously, we, as you saw on that last chart, believe we are relative low leverage with a very significant equity capital base. **And this is really the foundation of the balance sheet strength of our enterprise. Our loans are mostly senior mortgages. They're collateralized by high-quality assets. They're assets that we can underwrite, understand and asset manage. These are highly tangible businesses, highly tangible pieces of assets that we can underwrite. And, probably more importantly, there are loan bases in those assets and that high-quality capital represents a significant discount to replacement cost.** And for us, replacement cost is the strongest long-term indicator of value in the real estate sector.

The Good News

iSTAR FINANCIAL
Return on Ideas℠

- Relatively low leveraged
- $3.6 billion of adjusted equity (1)
- Loans are mostly senior mortgages
- Loan basis represents a significant discount to replacement cost
- Have unrealized gains throughout the portfolio
- Asset base is almost entirely unencumbered
  - $15 billion unencumbered assets across loan, CTL, AutoStar, iStar Europe, Corporate Fixed Income and TimberStar businesses
- Made many short-term, low LTC loans over the past two years
  - Specific goal of receiving capital back right when market might be correcting
  - $5.0 billion expected to come back in 2008
- Very valuable platform
  - Large investment capability able to see and capture strong risk-adjusted returns

(1) Adjusted equity represents book equity plus accumulated depreciation / depletion and loan loss reserves

* * *

1. Let me go to the not-so-good news, and these are some of the challenges we see in today's environment. First of all, as I think all of you are acutely aware, the unsecured debt and equity markets are just not that hospitable to us right now. What's interesting to me is since I know, and **I hope many of you know our**

> **debt is extremely well protected**, and I really haven't met anybody who doesn't believe that. We believe the dislocation in the debt markets is a technical factor that will correct over time. **Part of our job is to spread the message of how safe our balance sheet really is**.

* * *

And, lastly, I'm going to spend a minute on this, and **somewhat concerning to me is that the overall market is not really differentiating between some of the higher-quality stories out there and frankly some of the lower-quality stories**. And I guess I'd put it under the heading of **comparing commercial real estate loans to residential structured product is just not a very good comparison**. It's a very poor analogy ***and*** one that's not supported by the facts at all, but **it's something that we're going to have to be fairly diligent in showing people why we're not in those sectors**. And so what I'd like to do for you today is really talk a little bit about what we think are the four sectors in the real estate market and really differentiate them.

Now, the newspapers are never going to quite grasp the difference between the residential and the commercial markets, as well as the whole loan and structured product markets. But I like to think of the real estate umbrella as really these four quadrants, a simple two-by-two matrix, commercial, residential, whole loans and structured products.



> And, as you know, **we don't do residential and we don't do structured products. So iStar really is only in that lower left-hand corner. But I think it's informative to actually just spend a second comparing these different businesses and show you how different we think our business is compared to some of those others that you're going to read about quite a bit in the next year.**
>
> So let's talk about residential and commercial. Residential whole loans, small balances, tends to be an actuarial business. Probably the biggest flaw we've seen in that business over the years is it's a very one-sided business. As a borrower in the home loans sector, you get a free option. If rates fall or your credit improves, you can immediately pay off that loan. If rates rise or your credit actually worsens, you have a below-market loan for as long as 30 years. As a lender, that's not a very interesting proposition.
>
> What we like about the commercial sector is we can underwrite that asset very heavily. Typically, they're less commodity like. And properly structured, we get a fair bet, or sometimes even a better-than-fair bet, where if things go well we can actually make excess returns and things go bad, we have a hammer to actually work with that customer before the problem gets out of hand.
>
> So just looking at the residential versus commercial, we've always felt a better model was the commercial mortgage model. We think you can build a differentiated business model in that sector.
>
> * * *
>
> What we try to focus on with people is inside the iStar envelope, with the $15 billion of assets, you don't have any leverage. You own everything. You own from the first dollar up here down to here. **And we think it's a fundamentally different business, it's a different underwriting, and it's so much more safe and so much more secure that these ratings are very misleading.** And we think the structured product issues are things that are almost totally separate and apart. Now, they may have an impact on our core markets, and that's why we spend so much time analyzing those markets and presenting on those markets. [Emphasis added.]

**Defendants Highlight iStar's Loan Portfolio Safety and Its Risk Management Processes**

33. During the Investor Conference, Defendant O'Conner explained how management understood, conservatively valued and closely monitored iStar's loan portfolio, stating, in pertinent part:

> The first is our portfolio is very understandable. This is not complicated stuff. We're going to talk about again, in detail, as to how the portfolio breaks down, but

this is not black magic. This is simple, straightforward, easy to understand. **It's understandable, and we understand what we have**, very important.

The second piece is the portfolio is underwritable. **We can understand the risk in the portfolio, we assessed it at the outset, we continued to monitor that risk throughout the life of the investment so we can actually understand what's going on in our portfolio on a real-time basis.**

* * *

As we think about the portfolio, we really divide it into three components, three areas, the first being the loan component of the portfolio, our core loan portfolio, if you will. Weighted average loan to value of 67%, a very important statistic for us. I'm going to talk about this throughout my presentation, but a very important statistic.

We view that 67% as creating a 33% cushion between our last dollar of exposure and the value of the underlying collateral. **It provides for a lot of room for things to go wrong and for us to still be okay. So that's a statistic that we monitor closely and we watch on an ongoing basis**. I'm going to talk more about that as I continue. 78% of our loans, floating rate, 22% fixed rate, 3.2 weighted average maturity. **If, as we step back and think about our loan portfolio, we take into account that we have this embedded cushion by way of our loan to value, conservative position in the capital structure, combined with our on-balance sheet reserves, and the discount I just talked about from Fremont together provide a nice cushion for that portfolio.**

* * *

Today, condo and condo conversion loans make up a little over 16% of our overall portfolio. **So it's a significant part of our portfolio. It's a part of our portfolio that we understand, we think we understand very well**. We're going to talk about that in much more detail later this afternoon. But as I think about it and try to communicate with you, there's really two pieces of that.

* * *

I want to step back and talk for a minute about value, because we get asked questions about this a lot and it's the right question. And for those of you that haven't heard the answer before, many of you probably have, I'm going to go through it. **The values that we carry from quarter to quarter are our internal values, not appraisals, not third-parties. It's an internal iStar value where we sit down collectively and say, where would we want to own this asset? So for every loan that we underwrite, we're going to step back and say, where would we own this asset? And that's the value that we attribute to the transaction, not what someone else is telling us, and even moreover, not what the market is telling us**.

> Because what we learned over the last 2.5 years, we started to track as loans were either refinanced out of our portfolio, or assets were sold by our borrowers. And **what we found was that our internal values were some 30% less than what the market was attributing to those deals. So we think we have as part of the kind of DNA, the iStar DNA, a bias toward relative conservatism with respect to values** and it's all centered around replacement cost. [Emphasis added]

34. Defendant O'Conner then highlighted the Company's portfolio risk management processes, stating, in pertinent part:

> **Well, the first thing we do as a company is we devote a lot of people, a lot of assets and a lot of resources to watching the portfolio. We have 135 people that all they do from the time they get up to the time they leave work is watch our portfolio and watch our assets**. That's all they do. You're going to hear from some of them later today when we go through our panel discussions, but lots of resources, lots of depth, different talent sets and maybe most importantly, people that have lived through cycles, people that have been through from the early '90s through -- have lived through real estate cycles, so know what it's like when it gets ugly. It's pretty ugly, but we know what it's like when it gets ugly. We've got those people in house, and they're working our assets.
>
> * * *
>
> **Our entire risk management process is centered on information gathering and then actually, more important, information sharing within the firm**, because we believe that if we can get the benefit of that information from those 135 bodies on the ground, that **we as a senior management team can make very informed decisions as to strategies for changing things, getting ahead of problems, getting ahead of issues before they really become problems**. And that's really how we manage the portfolio.
>
> * * *
>
> [W]e risk weight each and every asset on a scale of one to five. One is least risk, five is the most risk, with respect to principal loss. We go through each and every asset. We talk about what's going on in the market, what's going on with the borrower, what's happening, and actually assign a numeric score to each and every investment.
>
> Perhaps not surprisingly, when you step back from that process and look at it, we effectively have a bell curve that distributes risk across the portfolio. If you look at the assets in what we've identified here as the ones and twos, those are assets we don't talk about much, certainly don't talk about much publicly. Those are the assets that we think are most secure in our portfolio, $2 billion. They're performing great.
>
> The assets in the middle, we don't talk about those publicly, either, but I can tell you we talk about those internally a lot, because those are the assets that we are most

> concerned are moving one way or the other and we've got to keep our eye on them, so we talk about those a lot.
>
> And then the last piece, **the fours and the fives, we obviously talk about them a lot**. We talk about them in our quarterly press releases. We talk about them in our quarterly conference calls, and we identify them and talk about them in a reasonable amount of detail. 92% of our NPL and watch lists are in that four and five bucket. So, like I said, we talk to them a lot to the outside world.
>
> **We talk about them weekly, if not more, inside the Company**. We have weekly meetings, again, the same process that we've had -- my start, from day one since I've been in, we sit and we say what's going on and what can we do about it? And what are we doing about it and how is the borrower reacting and how is the market reacting and what do we do? And that's not a decision that's made by someone sitting in Atlanta or someone that's sitting in San Francisco or someone that's sitting in Dallas. That's a decision that's made jointly with the people that you see here sitting in this room. And what strategy we do and how we do it and how we counter and how we try to fix, isn't left to somebody that's out in the field. **It's done by the senior people in this Company, and I think that's a significant differentiator in our business**. [Emphasis added.]

**Defendants Positively Describe iStar's Credit Quality**

35. During the Investor Conference, Defendant O'Conner also made positive statements about iStar's credit quality and its NPL portfolio and high risk loans that were placed on the Company's "watch list," stating, in pertinent part:

> I want to talk a little bit about NPLs [Non-Performing Loans] and watch lists over the next several pages. We do have 29 assets on NPL, so 642 investments in the portfolio. We currently have 29 assets on NPL. That's less than 3% of the total assets on our balance sheet.
>
> * * *
>
> Again, as most of you know, we do publish each quarter a watch list. So not only do we define NPLs, which we define what they are and how they fit in that bucket, we also have watch lists.

## iStar Credit Quality – Loan Portfolio

iSTAR FINANCIAL Return on Ideas℠

($ in millions)

| | # of Assets | Book Value |
|---|---|---|
| Loan Portfolio | 491 | $10,693.4 |
| Performing – Watch List | 28 | 610.5 |
| NPLs | 29 | 428.7 |




Note: As of September 30, 2007

30

Our watch list assets are performing assets. They're receiving debt service, we are getting paid as agreed, but **we as a management team are concerned and want to do two things. One, we want to flag and show the market, hey, we're concerned about these. Two, we want to flag internally to people, hey, these are assets that we are talking about every week, if not more.** And again, it's in the context of this pie chart, 6% of the total assets are in fact on watch list in the loan portfolio.

We try to step back and put some of this in perspective. The white box on this page, again, is back to total portfolio, our performing watch list assets and what are our NPLs. The far right column, managed column, that's what we report. Center column, that's what's on our balance sheet, that's what's on our books.

iStar Credit Quality

iSTAR FINANCIAL
Return on Ideas℠

($ in millions)

| | # of Assets | Book Value | Managed Assets [1] |
|---|---|---|---|
| **Total iStar Portfolio** | 642 | $15,145.4 | $18,566.1 |
| Total Performing | 613 | 14,716.7 | 17,717.4 |
| *Performing – Watch List* | *28* | *610.5* | *1,095.8* |
| NPL | 29 | 428.7 | 848.7 |
| **iStar Core Loan Portfolio** | 264 | $8,605.3 | $8,605.3 |
| Total Performing | 257 | 8,396.6 | 8,396.6 |
| *Performing – Watch List* | *6* | *314.5* | *314.5* |
| NPL | 7 | 208.6 | 208.6 |
| **Fremont Legacy Portfolio** | 233 | $2,088.1 | $5,508.8 |
| Total Performing | 211 | 1,868.1 | 4,868.8 |
| *Performing – Watch List* | *22* | *296.0* | *781.3* |
| NPL | 22 | 220.1 | 640.1 |

Note: As of September 30, 2007

[1] Managed assets represent iStar's book value plus Fremont's A-participation

31

The only reason why on the bottom here we've shown iStar core portfolio and Fremont legacy portfolios is to point out a couple of things I touched on earlier. One is with respect to the Fremont portfolio, we have marked that portfolio. We marked it as of a couple of months ago and the 18 assets that we talked about earlier, guess what, those assets are up here. Okay, so we're starting from a point where we say we've marked the assets to bring them on the books. We knew they were NPLs when we closed on this transaction. We marked them, they were NPLs, they're NPLs now.

The other reason why I put this up here is if you look at the percentage of NPLs, and again, this is watch lists and NPLs. We underwrote the Fremont transaction. We knew we were going to have plus or minus X number of dollars watch list and X number of dollars NPL. Not a surprise. This is not a surprise to us. **We mentioned on our last earnings call, how is the portfolio performing? It's performing pretty much as expected, pretty much as expected.**

**Now, the market's gotten worse and there are some challenges we have to deal with, but as far as where we underwrote and how the portfolio is performing, it's performing pretty much as expected**.

* * *

Okay, lots of press, lots of concern, certainly legitimate concern about certain markets and where are the assets and let's fill into the detail. What we wanted to do is we highlighted five markets, plus or minus, here and to give a sense as to, okay, here's our NPL list and how do they fall in these various markets that people are very concerned about, that we're very concerned about.

iStar Credit Quality

iSTAR | FINANCIAL
Return on Ideas℠

Performing – Watch List loans by select geographic locations

| | Book Value | | Managed Assets (1) | |
|---|---|---|---|---|
| | Total ($ millions) | % Total Assets | Total ($ millions) | % Total Assets |
| **Select Geographic Locations** | | | | |
| Florida | $29.5 | 0.2% | $78.4 | 0.4% |
| *Miami* | *0.0* | *0.0%* | *0.0* | *0.0%* |
| *West Coast Florida* | *0.0* | *0.0%* | *0.0* | *0.0%* |
| Southern California | 59.7 | 0.4% | 153.3 | 0.8% |
| Las Vegas | 6.8 | 0.0% | 16.9 | 0.1% |
| New York City | 0.0 | 0.0% | 0.0 | 0.0% |
| Phoenix | 0.0 | 0.0% | 0.0 | 0.0% |
| Other | 514.5 | 3.4% | 847.2 | 4.5% |
| **Total Portfolio** | $610.5 | 4.0% | $1,095.8 | 5.9% |

Note: As of September 30, 2007

(1) Managed assets represent iStar's book value plus Fremont A-participation

33

So we start, and I would start at the bottom and say, Phoenix, we don't have anything, New York, we don't have anything, Las Vegas, there's not anything on non-performers now. Southern California, one small transactions and then up the west coast of Florida. The west coast of Florida, these transactions in this bucket are primarily Tampa, Clearwater, Sarasota. These are primarily the condo conversion transactions, transactions that we knew about, transactions that are going to be challenging to work through and take time, as Jay suggested, but transactions that we understood going into the deal.

The next page gives you just the same look on a slightly different basis, but it's the same cut with respect to watch list transactions.

And again, **from our perspective, no surprises here, no surprises here, and I would hope that people would come and say, hey, it looks like some of these markets, at least right now, that people are very concerned about, we don't have a lot of exposure to**. [Emphasis added.]

36. Defendant O'Conner also stated that the loss exposure on iStar's loan portfolio was limited, due to three factors: (1) the amount of borrower equity in the Company's portfolio;[1] (2) the percentage of senior loans in the Company's portfolio; and (3) amount of the Company's loan loss reserves. Defendant O'Conner, stated, in pertinent part:

> I would say we take comfort in three things. One, let's look at how much borrower equity there is in our portfolio. That's kind of the first line of defense. That's going to determine what's the probability that we're going to get nicked, okay? And then the second line of defense is let's look at our position. And we're talking again about senior, secured positions. Historically, senior, secured positions, the severity of loss of those positions is less. It has been, and will be. So borrower equity, first mortgage position, and then if all else fails, guess what, you've got to drop back and you've got to have something behind you, and what we have is our reserves. We have $125 million or $124-ish million of on balance sheet reserves.

Risk Management and Credit Quality

iSTAR FINANCIAL Return on Ideas℠

Adequate loan loss reserves and strong CTL credit enhancement

| | Q3'07 | |
|---|---|---|
| | Total ($ millions) | % of Total Loans |
| **Loans:** | | |
| On-balance sheet reserves | $124.2 | 1.2% |
| Remaining Fremont purchase discount | 220.8 | 2.1% |
| Total loan loss coverage | $345.0 | 3.3% |

| | Q3'07 | |
|---|---|---|
| | Total ($ millions) | % of Total CTLs |
| **CTLs:** | | |
| Accumulated depreciation | $411.6 | 10.7% |

Note: As of September 30, 2007

34

[1] Generally, borrowers' equity refers to the amount of capital a borrower has at risk. The general view is that if the borrower has more equity at risk, the borrower is more apt to work through a financial difficulty than default on a mortgage loan.

> We've grown that number [loan loss reserve]. Again, for those of you that have followed us, we've been growing that over years now, continue to grow that number. And we also have the benefit of this discount on the Fremont purchase that effectively provides a cushion to our portfolio.
>
> **So if you step back and look at it, we have available to us as kind of a bucket to address these issues, $345 million. It's a lot of money to address issues in the portfolio**.
>
> * * *
>
> Okay, try to back up, summarize and have Jay come up here. Started by talking about Fremont, integration's going well, not quite done yet, lots of progress. We have a bigger portfolio today than we had a year ago. We do.
>
> **We think that we've maintained some of the same story, or we have maintained some of the same story with respect to our position in the capital structure, first mortgages, lots of cushion.** In my mind, that's never going away at iStar. It's just part of who we are, it's part of how we operate. It's how we do business.
>
> **The good news is, as much as the markets are noticeably worse today, materially worse than they were a year ago, our on-balance sheet reserve, our cushion, is significantly greater than it was a year ago.**
>
> And then lastly, just the point again, lots of unencumbered assets. And then finally, we have what we believe is the right team in what is a very difficult, and we think will be a difficult environment for the next 12 to 24 months. We've got the right team on the ground, process in place, to work our way through this. [Emphasis added.]

**Defendants Highlight iStar's Financial Highlights and Near Term Funding Requirements**

37. During the Investor Conference, Defendant Rice highlighted iStar's financial performance and minimized the Company's short term capital requirements, stating, in pertinent part:

> As you've heard on our third quarter earnings call, we've had solid year-to-date financial performance, with adjusted earnings up 11% and revenues up 45% from the same period in 2006. **We announced 2008 adjusted earnings guidance of $4 to $4.20. And we continued to deliver strong returns at reasonable leverage levels. We announced a 5% increase to our quarterly dividend, which will be payable in the fourth quarter.**
>
> And **due to the increase in income that we're receiving from the Fremont portfolio, we'll be declaring a special dividend in 2007 that should be in the**

**range of $0.15 to $0.30 a share.** Typically, we consider dividend increases in the first quarter. And as you can see on the chart, we have increased our dividends significantly and consistently since we went public in 1998.




We spent a few minutes walking you through on the earnings call our sources and uses of capital through 2008, and we wanted to give you a quick update. This data is as of the end of November. And, as you can see on the left side, funds are available, our sources of capital. We have about $5 billion of regularly scheduled maturities from borrowers and amortization. We tried to be conservative in this estimate, given the fact that many of our borrowers, particularly in the next couple of months, will have a difficult time refinancing our mortgages, given the dislocations in the real estate credit market.

We also have $1. 5 billion of capacity on our credit facilities for a total sources of about $6.5 billion. If you look to the right, our financing needs include about 4.4 billion of unfunded commitments. This includes both the Fremont portfolio, as well as the iStar portfolio. As we talked about on the call, a number of these projects are early-stage projects that may or may not get funded over time.

In addition, we have about $2.1 billion of debt maturities in 2008, for a total of $6.5 billion. So, as you can see, assuming no additional investment activity, we have minimal capital raising requirements in 2008. [Emphasis added.]

Wrap-Up

iSTAR | FINANCIAL
Return on Ideas℠

- Strong balance sheet, experienced management team, well positioned for current market environment
  - 2008 Adjusted EPS guidance of $4.00 - $4.20
  - Minimal capital raise requirements through 2008
  - $15 billion of unencumbered assets available
  - Solid ROE's at lower leverage
- Well diversified portfolio
  - Loans:
    - Conservative LTVs provide cushion and reduce loss probability
    - Senior secured positions reduce loss severity
    - $345 million combined reserves and Fremont discount provide further protection
  - Leases:
    - Significant embedded gains throughout portfolio
  - Other Platforms:
    - Overall gains in value
- iStar's goal is to be the clear market leader in the commercial real estate finance sector

| | | |
|---|---|---|
| – Strongest balance sheet | – Most diversified portfolio | – Long standing reputation for integrity |
| – Largest enterprise value | – Lowest leverage capital structure | – Broadest knowledge base |
| – Most stable earnings | – Deepest in-house capabilities | – Disciplined investment process |

59

38. Following the Investor Conference, analysts trumpeted what Defendants had told them about the strength of the Company's balance sheet and loan portfolio. For example:

<u>Bear Stearns</u> – December 11, 2007

**Investor Day Adds Clarity**

• **Investor Day**. iStar held its second annual investor day last week. **The presentation sought to distinguish iStar's business model** from other more highly levered companies and structured finance vehicles. **The company also sought to calm concerns regarding the credit quality of the Fremont portfolio, demonstrate its strategic benefits, and address future capital needs**.

<u>Key Banc</u> – December 7, 2007

**We believe SFI has a strong balance sheet**, with more than $15 billion of unencumbered assets, favoring unsecured and secured debt over the collateralized debt obligation model used by many of its peers. The Company worked hard to achieve investment grade status, but must also comply with the agencies more stringent requirements, including lower leverage. The Company's leverage ratio is

> 3.25x. SFI anticipates minimal capital raising in 2008 as its sources of cash closely match its needs next year.
>
> **SFI appears to be comfortable with the credit quality of its core portfolio**. Most of its loans are senior mortgages and the weighted average LTV of the portfolio is 67%. The corporate tenant lease portfolio is viewed as a long-term stable cash flow business, with properties 96% leased and 11.2 years average remaining lease term; 31% are investment grade credits. SFI's assets are well-diversified by location and collateral type. The Company maintains a 135-person risk management team, which is well-tenured with extensive resources. Non-performing loans total $428.7 million, or 3% of total assets. [Emphasis added.]

### The Secondary Offering

39. On or about May 1, 2007, iStar filed the Registration Statement with the Securities and Exchange Commission ("SEC"). The Registration Statement was filed on a Form S-3 and offered to sell, over time, common stock, preferred stock, depository shares debt securities and warrants of the Company. Accordingly, the Secondary Offering was considered to be a "shelf registration" that allowed the Company to register securities for sale while leaving them on the "shelf" until it determined to conduct the offering, provided, however, that the Registration Statement meet all the requirements proscribed under applicable securities regulations, including that the information contained therein be current.

40. On or about October 9, 2007, iStar filed the Prospectus that formed part of the Registration Statement associated with the Secondary Offering.

41. On or about December 13, 2007, iStar filed the Prospectus Supplement, which offered six million common shares to the public. On or about December 14, 2007, the Registration Statement, which incorporated the Prospectus and the Prospectus Supplement, became effective and at least six million shares of iStar common stock were sold at $28.41 per share to the public. On or about December 17, 2007, iStar amended the Prospectus Supplement to increase the number of common shares offered to the public from six to eight million.

42. The proceeds iStar received from the Secondary Offering were in excess of $218 million. The Prospectus Supplement represented that the Company intended to use the proceeds from the Secondary Offering to pay down an existing short-term financing facility it utilized to acquire Fremont.

**The Registration Statement was Materially False and Misleading and Failed to Disclose Facts Required to be Stated Therein**

43. The Registration Statement, which incorporated the Prospectus and the Prospectus Supplements, issued in connection with the Secondary Offering was negligently prepared and, as a result, contained numerous untrue statements of material fact and omitted to disclose material information which was required to be disclosed pursuant to the regulations governing its preparation.

**Failure To Disclose "Material Changes"**

44. As noted above, iStar filed the Registration Statement on Form S-3, which is a stream-lined registration statement for certain well-capitalized, widely followed issuers. Such issuers are permitted to file scaled down registration statements and incorporate by reference their prior periodic filings – *e.g.*, Forms 10-K and 10-Q. Pursuant to Instruction 11(a) of Form S-3, an issuer utilizing Form S-3 must disclose "***any and all material changes*** in the registrant's affairs which have occurred since the end of the latest fiscal year for which certified financial statements were included in the latest annual report to shareholders and which have not been described in a report on Form 10-Q or Form 8-K filed under the Securities Exchange Act of 1934." [Emphasis added.]

45. Accordingly, an issuer utilizing Form S-3 is required to update the information in its periodic filings including information concerning "known trends and uncertainties" with respect to "net sales or revenues or income from continuing operations" which is required to be disclosed in SEC periodic filings pursuant to Item 303(a) of Regulation S-K. Under Item 303(a) an issuer is

required to "describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

46. Here, the Registration Statement negligently failed to disclose several "material changes" to iStar's continuing operations which were required to be disclosed pursuant to Instruction 11(a). None of these "material changes" were disclosed in the SEC filings that iStar incorporated by reference in the Registration Statement and, therefore, the Registration Statement omitted to state material facts required to be stated therein in violation of the Securities Act.

47. **The Material Decline In Debt Security Values**: By the time of the Secondary Offering, the amount of the unrealized losses on iStar's held-to-maturity investments had increased by approximately $60 million -- almost 100% since the end of its third quarter, the period ended September 30, 2007. These increased losses represented more than twenty (20) percent of all income from continuing operations iStar reported during the first nine months of 2007.

48. On or about November 9, 2007, iStar filed its Form 10-Q with the SEC for the third quarter of 2007, the period ending September 30, 2007 (the "Third Quarter 10-Q"). The Third Quarter 10-Q was incorporated by reference in the Registration Statement.

49. With respect to the iStar's held-to-maturity investments, the Third Quarter 10-Q stated, in pertinent part:

> As of September 30, 2007, the carrying value of Other Lending Investment-Securities includes $586.2 million of held-to-maturity investments with an aggregate fair value of $526.9 million and gross unrealized gains and losses of $8.1 million and $67.3 million, respectively.

50. By the time of the Secondary Offering, however, iStar had suffered a material, incremental unrealized loss on its held-to-maturity investments of approximately $60 million. In

particular, the Company incurred material incremental losses on its undisclosed Linens 'n Things ("LNT") and WCI Communities ("WCI") debt securities.

51. At the time of the Secondary Offering, both LNT and WCI were in dire financial condition and were on the brink of bankruptcy. In fact, the price of LNT and WCI debt securities held by iStar declined by approximately 50% in value from early 2007 through the date of the Secondary Offering.

52. Defendants knew that iStar's held-to-maturity investments had experienced a material decline in the value between September 30, 2007 and the time of the Secondary Offering on or about December 14, 2007 as the prices of the debt securities of LNT and WCI had traded in the bond market at severely depressed prices for an extended period of time. Defendants also knew that applicable accounting standards required that the Company record a charge for the impairment in the value of iStar's held-to-maturity investments during the fourth quarter of 2007.

53. Indeed, Defendants knew or negligently ignored the following adverse facts about WCI and LNT that were in existence at the time of the Secondary Offering:

**WCI**

- On November 7, 2007, *PrimeNewsWire* reported that Jerry Starkey, President and CEO of WCI stated 'this prolonged downturn requires that we continue to assess our overhead and make reductions in order to remain viable through the trough of this cycle" and that "WCI announced another significant reduction to its workforce in response to continued soft demand in its markets." As a part of this restructuring, iStar combined several lines of business, implemented a net reduction in force of about 575 employees which, when combined with previous reductions in force represented a 46% decline from its 2006 employment level, and its Board of Directors significantly reduce its compensation with six board members agreeing to forego all director compensation.

- On November 8, 2007, *The Associated Press* reported, "Moody's on Thursday cut its credit ratings on struggling Florida homebuilder WCI Communities Inc. deeper into junk status and suggested they could move even lower as the housing slump worsens. The credit rating agency cut

WCI's corporate family rating to Caa2 from B3, and the ratings on its senior subordinated notes to Caa3 from Caa2. Moody's cited WCI's "substantially weaker-than-expected cash flow generation, continued difficulties in complying with bank covenants, accelerating losses and increasing debt leverage."

- November 12, 2007, the shares of WCI trade at a ***ten*** year low, declining from more than $20 per share in early 2007 to less than $5 per share at the time of the Secondary Offering.

- On November 15, 2007, WCI Communities Inc reported that EBITDA for its twelve months ended September 30, 2007 was a negative $(62,064,000), compared with a positive EBITDA of $288,411,000 for the comparable year earlier twelve months.

- On November 27, 2007, *The New York Sun*, reported, "A Banc of America Securities analyst, Daniel Oppenheim, is one of a number of homebuilding analysts who takes a dim view of WCI, which is awash in red ink. In its most recent quarter, WCI reported a loss of $1.66 a share, much greater than Street expectations, in large part due to higher charges. Liquidity issues are likely to increase, Mr. Oppenheim warns, citing a deteriorating cash flow outlook. The company has reported it is not in compliance with its fixed-charged covenant and the analyst expects lenders to be less flexible in renegotiations, given the deterioration in Florida. Even if a favorable income is reached, WCI will have just $210 million in liquidity, which Mr. Oppenheim believes will quickly erode.

- On November 20, 2007, *Thomson Financial News* reported, "Standard & Poor's Ratings Services lowered its junk corporate credit rating on WCI Communities Inc to 'CCC' from 'CCC+', citing a sharp spike in cancelled contracts to buy the company's luxury high-rise condominiums and the company's need to once again renegotiate the terms of its revolving credit facility. The outlook on WCI remains negative.

- On December 3, 2007, *Market News Publishing, Inc.*, reported "Of the 24 builders Standard & Poor's rates, five are currently in the 'BBB' category, seven are in the 'BB' category, and 10 are in the 'B' category. The other two companies have fallen into the low speculative-grade realm: WCI Communities is rated 'CCC' and TOUSA is rated 'CC'. U.S. homebuilders face an array of challenges at this point in the housing cycle, many of which will likely worsen before they improve. While unit deliveries were up in the recent fiscal quarter, there's little evidence to suggest that companies will be able to quickly replenish shrinking order backlogs. Additionally, impairment charges were huge in the recent fiscal quarter, as builders wrote off $6 billion on inventory, goodwill, and option deposits as home prices continued to drift lower and absorption slowed."

- In its Form 10-Q for the quarter ended September 30, 2007, WCI disclosed that is was not in compliance with a debt covenant under a revolving credit facility and term loan agreement.

**LNT**

- On August 15, 2007, Deutsche Bank Securities reiterated its Sell rating on LNT's bonds.

- On October 2, 2007, Fitch Ratings Downgraded LNT as follows: Issuer Default Rating (IDR) to 'CCC' from 'B-'; Asset-based revolver to 'B-/RR2' from 'B+/RR2'; Senior secured notes to 'CCC-/RR5' from 'CCC/RR6'. The Rating Outlook is Stable. The downgrades reflected LNT's continued weak operating performance which has resulted in worsening credit metrics and negative cash flow generation as well as the challenging operating environment and intense competition from other specialty retailers, discounters and department stores in the home furnishings segment.

- On October 15, 2007, *Standard & Poor's Ratings Services* slashed the corporate credit rating on LNT to 'B-' from 'B' and removed the ratings from CreditWatch, where they had been placed with negative implications on Nov. 17, 2006 and lowered the bank loan rating on the Company's $650 million floating-rate senior secured notes to 'CCC' (two notches below its corporate credit rating). The downgrade was a result of LNTs' "continued weak operating performance and poor profitability and productivity relative to its key competitor" as well as a "very high debt leverage and extremely thin interest coverage." *Standard & Poor's* also announced that the outlook was negative.

- On November 13, 2007, LNT reported that adjusted EBITDA for the third quarter of 2007, the quarter ended September 30, 2007 was negative ($3) million compared with adjusted EBITDA of positive $21.5 million in the third quarter of 2006, a decrease of $24.5 million.

54. Defendants negligently failed to disclose the approximate $60 million incremental unrealized loss on iStar's held-to-maturity investments that constituted a "material change" in the Company's operations. Since such incremental loss was then having, and would have, a material unfavorable impact on the Company's operating income, it was required to be disclosed in the Registration Statement. The disclosure concerning an approximate $60 million decline in the value of iStar's held-to-maturity investments securities would have materially altered the total mix of

information available to investors in the Secondary Offering as it would have provided information necessary for an informed investment decision about the Company's income and assets.

55. On February 28, 2008, in connection with announcing its financial results for the fourth quarter of 2007 and fiscal year 2007, the periods ending December 31, 2007, iStar announced, among other things, that it recorded a $135 million charge associated with the "impairment of two credits." The facts and circumstances that caused the Company to take this charge as of December 31, 2007, existed on December 14, 2007, the date of the Secondary Offering, and were, therefore, required to be disclosed in the Registration Statement, but were not.

56. Furthermore, iStar blamed its disappointing 2007 fourth quarter financial results on the impairment charge it recorded on its held-to-maturity investments. Accordingly, by Defendants' own admission, the charge iStar recorded in connection with the decline in value of such debt securities negatively impacted the Company's continuing operating results during the fourth quarter of 2007.

57. **The Material Increase in Loan Losses:** The Registration Statement also negligently failed to disclose that losses in iStar's loan portfolio increased dramatically between September 30, 2007 and the time of the Secondary Offering.

58. During the fourth quarter of 2007, the economic and financial conditions deteriorated significantly. These trends and events had a material adverse effect on market liquidity generally and the value of iStar's loan portfolio specifically.

59. During the first nine months of 2007, iStar recorded a cumulative $72 million charge against earnings for loan losses. For the fourth quarter of 2007, the last ***three*** months of 2007, iStar recorded a $113 million charge for loan losses. This amount exceed the total loan losses iStar

reported during the first ***nine*** months of 2007 combined by 57% and approximated ***forty percent*** of all of the income iStar reported from continuing operations during the first nine months of 2007.

60. Indeed, Defendants knew that iStar's loan portfolio had experienced material decline in value between September 30, 2007 and the time of the Secondary Offering on or about December 14, 2007. At the Investor Conference, just days before the Secondary Offering, Defendant O'Conner represented to investors that management monitored iStar's portfolio risk on a real-time basis, stating, in pertinent part:

> We can understand the risk in the portfolio, we assessed it at the outset, we continued to monitor that risk throughout the life of the investment so ***we can actually understand what's going on in our portfolio on a <u>real-time</u> basis***. [Emphasis added.]

61. Defendants negligently failed to disclose the approximate $110 million incremental increase in iStar's loan loss reserves that constituted a "material change" in the Company's operations. Since such incremental increase in loan loss reserves was then having, and would have, a material unfavorable impact on the Company's operating income, it was required to be disclosed in the Registration Statement. The disclosure concerning an approximate $110 million increase in iStar's loan loss reserves would have materially altered the total mix of information available to investors in the Secondary Offering as it would have provided.

62. On February 28, 2008, in connection with announcing its financial results for the fourth quarter of 2007 and fiscal year 2007, the periods ending December 31, 2007, iStar announced, among other things, that it recorded a $113 million charge associated with an increase in its loan loss reserves. The facts and circumstances that caused the Company to take this charge as of December 31, 2007, existed on December 14, 2007, the date of the Secondary Offering and were, therefore, required to be disclosed in the Registration Statement, but were not.

63. Furthermore, iStar blamed its disappointing 2007 fourth quarter financial results on the charge it recorded on the increase in its loan loss reserves. Accordingly, by Defendants' own admission, the charge iStar recorded in connection with the decline in value of its loan portfolio negatively impacted the Company's continuing operating results during the fourth quarter of 2007.

64. **Material Decline in Credit Quality:** The Registration Statement negligently failed to disclose that iStar had a material increase in the amount of its NPLs and watch list assets.

65. In the Third quarter 10-Q, which was incorporated by reference in the Registration Statement, contained a chart detailing the Company's loan loss reserves, NPLs and watch list assets as follows:

Risk Management

Loan Credit Statistics--The table below summarizes our non-performing loans and details the reserve for loan losses associated with our loans (in thousands):

| | As of September 30, 2007 | As of December 31, 2006 |
|---|---|---|
| Non-performing loans | | |
| Carrying value | $428,694 | $61,480 |
| Participated portion | 420,020 | -- |
| Gross book value | $848,714 | $61,480 |
| As a percentage of total assets | 5.5% | 0.6% |
| As a percentage of total loans | 8.4% | 1.0% |
| Reserve for loan losses | $124,201 | $52,201 |
| As a percentage of total loans | 1.2% | 0.9% |
| Watch list loans | | |
| Carrying value | $610,536 | $147,800 |
| Participated portion | 485,280 | |
| Gross book value | $1,095,816 | $147,800 |

Non-Performing Loans--All non-performing loans are placed on non-accrual status and income is recognized only upon actual cash receipt. We designate loans as non-performing at such time as: (1) management determines the borrower is incapable of, or has ceased efforts towards, curing the cause of an impairment; (2) the loan becomes 90 days delinquent; (3) the loan has a maturity default; or (4) the net

> realizable value of the loan's underlying collateral approximates our carrying value of such loan. As of September 30, 2007, we had 29 non-performing loans with an aggregate carrying value of $428.7 million and an aggregate gross book value of $848.7 million, or 5.5% of total assets. Management believes there is adequate collateral and reserves to support the book values of the loans.
>
> * * *
>
> Watch List Assets--We conduct a quarterly comprehensive credit review, resulting in an individual risk rating being assigned to each asset. This review is designed to enable management to evaluate and proactively manage asset-specific credit issues and identify credit trends on a portfolio-wide basis as an "early warning system." As of September 30, 2007, we had 28 assets on the credit watch list, excluding those assets included in non-performing loans above, with an aggregate carrying value of $610.5 million and an aggregate gross book value of $1.10 billion, or 7.2% of total assets.

66. By the time the Secondary Offering, on or about December 14, 2007, the carrying value of iStar's NPLs increased by more than 50% since September 30, 2007 and the carrying value of iStar's watch list assets increased by approximately 100% since September 30, 2007**.**

67. Defendants knew that between September 30, 2007 and the time of the Secondary Offering on or about December 14, 2007, the credit quality of iStar's loan portfolio declined precipitously causing a sharp spike in the Company's NPLs and watch list assets by the time of the Secondary Offering. In fact, as noted above, just days before the Secondary Offering during the Investor Conference, Defendant O'Conner represented to investors that management inspected the Company's 4 and 5 rated loans (which composed 92% of iStar's NPLs and watch list assets) **"**every week, if not more**."**

**Misleading Risk Disclosures**

68. Pursuant to Item 3 of Form S-3 the Registration Statement was required to furnish the information pursuant to Item 503 of Regulation S-K [17 C.F.R. §229.303], including, among other things, a "discussion of the most significant factors that make the offering risky or speculative."

69. The Registration Statement incorporated by reference the "Risk Factors" set forth in iStar's 2006 Form 10-K. None of these so-called risk disclosures were meaningful or advised investors in the Secondary Offering of the problems in the Company's corporate loan and debt portfolio then impacting the Company's operations as they characterized any impairment and credit issues as prospective when, in fact, the Company was then being negatively impacted by the problems. Indeed, the crisis in the U.S. financial markets had increased dramatically from the time iStar filed its 2006 Form 10-K with the SEC and the Secondary Offering in mid-December 2007.

70. Accordingly, the Registration Statement negligently failed to disclose the most significant factors that made the Secondary Offering risky or speculative as required by Item 3 of Form S-3, including the extent to which deterioration in the economy and financial markets adversely affected the quality of iStar's loan portfolio.

**Inaccurate Financial Statements**

71. As noted above, the Registration Statement and the Prospectus incorporated by reference the financial statements contained in iStar's 2006 Annual Report on Form 10-K and its 2007 Quarterly Reports on Form 10-Q.

72. The unaudited financial statements included in the Third Quarter 10-Q were materially inaccurate in that they negligently failed to disclose facts, referred to under Generally Accepted Accounting Principles ("GAAP") as "subsequent events," evidencing the adverse conditions loans that were reasonably likely to have a material effect on the value of certain of the Company's investments in debt securities. These facts, which were required to be disclosed pursuant to GAAP, were necessary to make the interim financial statements not false and/or misleading. Regulation S-X [17 C.F.R. §210.4-01.(a)(1)] states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and

inaccurate. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. Generally Accepted Auditing Standard ("GAAS") AU §411.02.

73. GAAP, in its Emerging Issues Task Force ("EITF") Topic D-86, provides:

> A registrant and its independent auditor have responsibilities with regard to post-balance-sheet-date subsequent events, as well as the application of authoritative literature applicable to such events.

74. Concerning subsequent events, EITF Topic D-86 makes reference to the American Institute of Certified Public Accountant's ("AICPA") Statement on Auditing Standards ("SAS") No. 1, *Subsequent Events* (or AU §560), which, in pertinent part, states:

> [E]vents or transactions sometimes occur subsequent to the balance-sheet date, but prior to the issuance of the financial statements that have a material effect on the financial statements and therefore require adjustment or disclosure in the statements. These occurrences hereinafter are referred to as "subsequent events."
>
> The first type [of subsequent event] consists of those events that provide additional evidence with respect to conditions that existed at the date of the balance sheet and affect the estimates inherent in the process of preparing financial statements. . . .
>
> *The second type [of subsequent event] consists of those events that provide evidence with respect to conditions that did not exist at the date of the balance sheet being reported on but arose subsequent to that date. These events should not result in adjustment of the financial statements.* **Some of these events, however, may be of such a nature that disclosure of them is required to keep the financial statements from being misleading**. . . .
>
> * * *
>
> When financial statements are reissued, for example, in reports filed with the Securities and Exchange Commission or other regulatory agencies, events that require disclosure in the reissued financial statements to keep them from being misleading may have occurred subsequent to the original issuance of the financial statements. [Emphasis added.]

75. iStar's financial statements in the Third Quarter 10-Q falsely represented that "[t]he accompanying unaudited Consolidated Financial Statements have been prepared in accordance with the instructions to Form 10-Q and Article 10-01 of Regulation S-X for interim financial statements."

76. Article 10 of Regulation S-X [17 C.F.R. §210.10-01.(a)(5)] provides, in pertinent part, that:

- Interim financial information shall include disclosure either on the face of the financial statements or in accompanying footnotes sufficient so as to make the interim information presented not misleading;

- Disclosure shall be provided where events subsequent to the end of the most recent fiscal year have occurred which have a material impact on the registrant; and

- Where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred.

77. iStar misrepresented that the interim financial statements were presented in conformity with the requirements of Article 10 of Regulation S-X.

78. As noted above, by the time the Registration Statement was declared effective by the SEC, the deteriorating economic and financial conditions had a material adverse effect on the value of iStar's loan portfolio. In fact, between September 30, 2007 and the Secondary Offering, **the value of iStar's loan portfolio declined by almost $170 million dollars, an amount that wiped out almost 60% of iStar's earnings from its continuing operations during the first nine months of 2007**.

79. These material "subsequent events," which were required to be disclosed pursuant to GAAP and the requirements of Article 10 of Regulation S-X, were negligently omitted from the financial statements incorporated by reference in the Registration Statement and Prospectus.

80. Accordingly, iStar negligently misrepresented in the Registration Statement and Prospectus that its financial statements were presented in conformity with GAAP and Article 10 of Regulation S-X, thereby rendering the Registration Statement materially inaccurate.

81. In addition to the violations of GAAP noted above, the financial statements incorporated by reference in the Registration Statement were presented in violation of at least the following provisions of GAAP:

(a) The principle that financial statements disclose loss contingencies when it is reasonably likely that a loss has been incurred. (Statement of Financial Accounting Standard No. 5);

(b) The principle that financial statements disclose certain significant risks and uncertainties. (Statement of Position No. 94-6);

(c) The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions. (Statement of Concepts ("Concepts Statement") No. 1, ¶34);

(d) The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources. (Concepts Statement No. 1, ¶40);

(e) The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general. (Concepts Statement No. 1, ¶50);

(f) The concept that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance. (Concepts Statement No. 1, ¶42);

(g) The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions. (Concepts Statement No. 2, ¶79); and

(h) The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent. (Concepts Statement No. 2, ¶¶95, 97).

82. The failure to incorporate by reference in the Registration Statement financial statements that conformed to the requirements of GAAP and Regulation S-X rendered the Registration Statement materially inaccurate.

**Post-Secondary Offering Disclosures**

83. On February 28, 2008, iStar issued a press release announcing its financial results for the fourth quarter of 2007 and full year 2007, the periods ending December 31, 2007. For the fourth quarter, the Company reported that its financial results were impacted by $134.9 million of charges associated with the "impairment of two credits" and a $113 million increase in its loan loss provisions. These two charges, which totaled approximately **a quarter of a billon** dollars, effectively wiped out close to 90% of the earnings iStar reported from its continuing operations during the first nine months of 2007. In addition, the Company reported that during the fourth quarter the amount of its NPLs and watch list assets increased by more than 65% and 100%, respectively. The press release, stated, in pertinent part:

- **Our quarterly earnings include both increased reserves and mark-to-market impairments, reflecting the impact of the current credit environment on specific investments in our portfolio, as well as the continued stresses in the overall market.**
- Included in fourth quarter earnings were $134.9 million of non-cash charges associated with the impairment of two credits that are accounted for as held-to-

maturity debt securities in its Corporate Loan and Debt portfolio. These securities are performing and continue to pay interest. Accounting standards for these securities do not allow for loan loss reserves to be taken on these assets; the standards require that the value be impaired based on a significant drop in market price and on management's current assessment that the decline is other than temporary.

- The Company had $217.9 million in loan loss reserves at December 31, 2007 versus $52.2 million at December 31, 2006. During the fourth quarter, the Company recorded $113.0 million in loan loss provision versus $62.0 million in the prior quarter. The $51.0 million quarter-over-quarter increase reflects the continued deterioration in the overall credit markets and its impact on the Company's portfolio as determined in its regular quarterly risk ratings review process.

- As expected, non-performing loans and watch list assets increased from the prior quarter. On December 31, 2007, the Company had 31 loans on NPL status representing $1.2 billion of gross loan value, compared to 29 loans on NPL status representing $848.7 million of gross loan value in the prior quarter. At the end of the fourth quarter, the Company had 40 loans on its watch list representing $1.6 billion of gross loan value, compared to 28 loans on its watch list representing $1.1 billion of gross loan value in the prior quarter. [Emphasis added.]

84. That same day, iStar held a conference call with securities analysts to discuss iStar's fourth quarter results and operations. On the conference call, Defendants Sugarman and Rice discussed the charges and increases in reserves, stating, in pertinent part, as follows:

Defendant Sugarman:

First, on the earnings front, our fourth quarter earnings included two **unusual** items, $135 million in non-cash impairments in our corporate loan invest portfolio and an increase loan loss provision of approximately $50 million higher than expected.

* * *

I would say as just a characterization, **the fourth quarter was unusual**.

Defendant Rice:

Our fourth quarter earnings clearly reflect the impact of the current credit environment on certain of our investments, as well as the continued stress in the overall market. Our adjusted earnings resulted in a loss this quarter of $36.6 million, or a loss of $0.29 per diluted common share.

Included in fourth quarter earnings were $135 million of non-cash charges associated with the impairment of two credits in our corporate loan and debt portfolio.

> Excluding the effect of the impairment for these two credits, adjusted earnings for the fourth quarter were $95.4 million or $0.74 per diluted common share.
>
> Let me provide you with some background on the impairments. We took a non-cash impairment charge totaling $135 million on two credits, which are accounted for as held to maturity debt securities. Both credits are performing and continue to pay interest. The accounting for these securities does not allow loan loss provisions to be taken against them, but requires that the value be impaired based on **a significant drop in market value for an extended or other than temporary period of time**.
>
> * * *
>
> As we mentioned earlier, **we took a relatively conservative stance based on the continued deterioration of the market and the impact we expect it to have on our portfolio. If the increase from our third quarter to our fourth quarter loan loss provision was also excluded, adjusted earnings per share would have been $4.14, in line with our guidance. However, the market has deteriorated somewhat more than we expected over the last quarter, and we believed it was prudent to increase our loan loss provision accordingly**, or by $51 million more than we originally modeled for the fourth quarter.
>
> * * *
>
> **[T]o the extent assets in that portfolio trade down significantly on a more than temporary basis, we are acquired to take an impairment based on the market trading**. So that group of assets, as we outlined, is only about $423 million. We took an impairment on two of the six assets in that bucket. And I'm sure you're well aware that the corporate debt market is being subjected to some fairly draconian trading levels at this point. I think **at the end of the quarter we felt, although we're still relatively confident in both of these assets, that we needed to take this impairment based on the market price**.

85. In response to the above statements, the price of iStar common stock declined approximately 12%.

86. During the next few days, iStar's common stock continued to decline as analysts downgraded their opinions of the Company, representing, in pertinent part:

<u>Credit Suisse</u> - February 28, 2008

> **NPLs Increase Across the Board**
>
> iStar Financial reported a 4Q adjusted EPS loss of $0.29, well below our estimate ($1.07). Credit losses, both asset impairments and higher provisioning, accounted for the lower than expected earnings.

Deutsche Bank - February 28, 2008

> **Downgrading to Hold given near-term risks**
>
> We are downgrading iStar to Hold from Buy, as we are concerned about near-term market deterioration resulting in continued elevated loss provisions. We believe these elevated loss provisions as well as increasing nonperforming loans could result in depressed earnings during the next few quarters.
>
> * * *
>
> Given the expectation of lower near-term earnings, management reduced 2008 adjusted earnings guidance to $3.50 to $4.00 per share from $4.00 to $4.20 per share.

Deutsche Bank - February 29, 2008

> **Disappointing 4Q results and 2008 guidance**
>
> We are reducing our 2008 estimate and price target after disappointing 4Q results. While we expect book value and the current yield to provide support for shares, our Hold rating reflects our belief that near-term upside is unlikely given concerns regarding loss provisions and increasing NPLs. While our new target is $26.50 per share, we believe our Hold rating is appropriate given near-term risks.
>
> * * *
>
> **Reducing price target to $26.50 per share from $42 per share**
>
> While our prior target was based on applying a 10x multiple to our 2008 adjusted earnings estimate, our new price target is based on applying a 7x multiple to our new 2009 adjusted earnings estimate. Given the near-term concerns (loss provisions and NPLs) and reduced visibility for our out year estimate, we believe a 7x multiple is appropriate. Historically, iStar has traded in a range of 6-13x forward adjusted earnings. While our target represents upside from the recent close price, we believe current risks limit near-term upside warranting a Hold rating.

87. On March 5, 2008 Citibank issued a downgrade on iStar stock.

88. On March 6, 2008, iStar stock was downgraded by Smith Barney, and the Company announced that Defendant Radesca reigned from his position as CAO on February 29, 2008.

89. Following Defendants' admissions regarding the impairment charges and increase in loan loss reserves, the price of iStar's common stock closed at $13.98, ***less than half*** of the price it sold for in the Secondary Offering and its closing high during the Class Period.

90. In its Form 10-K for the year ended December 31, 2007, the period that concluded just **<u>ten</u> additional business days from the time of the Secondary Offering**, iStar disclosed that it recorded a charge for impairment of two credits, materially increased loan loss reserves and that the value of it NPLs and watch list assets increased dramatically. The Form 10-K, stated, in pertinent part:

> **During the fourth quarter, we took a $134.9 million non-cash impairment charge on two of our credits accounted for as held-to-maturity debt securities that have <u>traded</u>** well below our carrying value.
>
> In addition, **based on increased risks in our loan portfolio, including those associated with the Fremont acquired loans, as well as the deterioration in economic and financial conditions, we had provisions for loan losses of $185.0 million during the yea**r, versus $14.0 million in 2006 and $2.3 million in 2005. **With the addition of the Fremont portfolio, we had material increases in our watch list and non-performing loans**. Our total loss coverage, defined as the combination of loan loss reserves and the remaining purchase discount on the acquisition, was $384.8 million or 3.6% of total loans, at the end of the year. **The impairments and additional loan loss reserves negatively impacted our return on common book equity and our adjusted return on common book equity this year.** [Emphasis added.]

## COUNT I

### Violations of Section 11 of the Securities Act Against All Defendants

91. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

92. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, and is asserted against all Defendants. For purposes of this Count, Plaintiffs affirmatively state that

they do not claim that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.

93. Plaintiffs purchased shares of iStar common stock directly in the Secondary Offering.

94. The Registration Statement, Prospectus and Prospectus Supplements for the Secondary Offering was defective and inaccurate, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

95. Defendant iStar is the registrant for the Secondary Offering. As such, iStar is strictly liable for the materially inaccurate statements contained in the Registration Statement, Prospectus and Prospectus Supplements and the failure of the Registration Statement, Prospectus and Prospectus Supplements to be complete and accurate.

96. The Individual Defendants each caused the issuance of the Registration Statement and/or signed the Registration Statement, either personally or through an Attorney-in-Fact. The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. They had a duty to ensure that such statements were true and accurate and that there were no omissions of material facts that would make the statements misleading. In the exercise of reasonable care, the Individual Defendants knew or should have known of the material misstatements and omissions contained in the Registration Statement, Prospectus and Prospectus Supplements and also should have known of the omissions of material fact necessary to make the statements made therein not misleading. As such, the Individual Defendants are liable to Plaintiffs and the Class.

97. The Underwriter Defendants were each underwriters, as that term is used in Section 11(a)(5) of the Securities Act, with respect to the Secondary Offering and the Company's securities

sold through the Registration Statement. The Underwriter Defendants were required to investigate with due diligence the representations contained therein to confirm that they did not contain materially misleading statements or omit material facts. None of the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements described herein, which were contained in the Registration Statement, Prospectus or Prospectus Supplements, were true, were without omission of any material facts, and/or were not misleading.

98. Lead Plaintiffs acquired iStar common stock in the Secondary Offering or traceable thereto in reliance upon the defective Registration Statement, Prospectus or Prospects Supplements and without knowledge of the untruths and/or omissions alleged herein. Plaintiffs and the Class sustained damages when the price of iStar common stock declined substantially due to material misstatements and/or omissions in the Registration Statement, Prospectus and Prospectus Supplements.

99. By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

100. This action was brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the Secondary Offering.

**COUNT II**

**Violations of Section 12(a)(2) of the Securities Act**
**Against All Defendants**

101. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

102. This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l, on behalf of Plaintiffs and the Class, against all Defendants. For purposes of this Count,

Plaintiffs affirmatively state that they do not claim that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.

103. Defendants issued, caused to be issued and/or signed the Registration Statement in connection with the Secondary Offering. The Registration Statement contained a Prospectus and Prospectus Supplements which was used to induce investors, such as the Lead Plaintiffs and the other members of the Class, to purchase iStar common stock.

104. The Prospectus and Prospectus Supplements contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein. The Individual Defendants' actions of solicitation to promote the Secondary Offering included participating in the Investor Conference and the preparation of a defective and inaccurate Prospectus and Prospectus Supplements.

105. Defendant iStar and the Underwriter Defendants, acting through their employees, agents and others, solicited such purchases for their personal financial gain through the preparation and/or dissemination of the Prospectus and Prospectus Supplements.

106. Pursuant to the Prospectus Supplements, the Underwriter Defendants purchased at least 6,912,000 iStar common stock at the public offering price, less an underwriting discount, in the Secondary Offering.

107. The Underwriter Defendants participated in the preparation and dissemination of the defective and inaccurate Prospectus and Prospectus Supplements for their own financial benefit. But for their participation in the Secondary Offering, including their solicitation as set forth herein, the Secondary Offering could not and would not have been accomplished. Specifically, the Underwriter Defendants:

(a) made the decision to conduct the Secondary Offering and do it at the price set forth in the offering documents. The Underwriter Defendants drafted, revised and/or approved the Prospectus and Prospectus Supplement. The Prospectus was calculated to create interest in iStar common stock and was widely distributed by or on behalf of the Underwriter Defendants for that purpose;

(b) finalized the Prospectus and caused it to become effective; and

(c) conceived and planned the Secondary Offering and orchestrated all activities necessary to affect the sale of these securities to the investing public, by issuing securities, promoting the securities and supervising their distribution and ultimate sale to the investing public.

108. As set forth more specifically above, the Prospectus and Prospectus Supplements contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in light of circumstances in which they were made, not misleading.

109. Plaintiffs and the other Class members did not know, nor could they have known, of the untruths or omissions contained in the Prospectus and Prospectus Supplements.

110. The Defendants named in this Count were obligated to make a reasonable and diligent investigation of the statements contained in the Prospectus and Prospectus Supplements to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading. None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectus and Prospectus Supplements were accurate and complete in all material respects. Had they done so, these Defendants would have known of the material misstatements and omissions alleged herein.

111. By reason of the conduct alleged herein, these Defendants violated Section 12(a)(2) of the Securities Act. Accordingly, Lead Plaintiffs and members of the Class who hold iStar common stock that was purchased in the Secondary Offering have the right to rescind and recover the consideration paid for their iStar common shares and hereby elect to rescind and tender their iStar common stock to the Defendants sued herein. Plaintiff and Class members who have sold their iStar common stock are entitled to rescissory damages.

**COUNT III**

**Violation of Section 15 of the Securities Act**
**Against the Individual Defendants**

112. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

113. This Count is brought pursuant to Section 15 of the Securities Act against the Individual Defendants. For purposes of this Count, Plaintiffs affirmatively state that they do not claim that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.

114. Each of the Individual Defendants acted as controlling persons of iStar within the meaning of Section 15 of the Securities Act by virtue of his position as a director and/or senior officer of iStar. By reason of their senior management positions and/or directorships at the Company, as alleged above, these Individual Defendants, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause iStar to engage in the conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 15 of the Securities Act.

115. Each of the Individual Defendants was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having

signed the Registration Statement and/or having otherwise participated in the process which allowed the Secondary Offering to be successfully completed.

**Exchange Act Count Allegations**

116. For the purposes of this section of the Complaint, the term "Defendants" refers only to Defendants iStar, Sugarman, Rice, and O'Conner.

117. On December 6, 2007, approximately seven days before the Secondary Offering, iStar held the Investor Conference at the New York Public Library. iStar's carefully choreographed Investor Conference presentation deceived investors about the Company in advance of the Secondary Offering. Defendants engaged in this fraudulent conduct to help insure a successful stock offering so that iStar would be able to procure the much-needed capital which was necessary to pay its maturing short-term credit facility at a time when the market conditions for capital raising had screeched to a decided halt.

118. For example, at the Investor Conference, Defendant Sugarman voiced a key objective of the conference: **"part of our job is to spread the message of how safe our balance sheet really is."** Defendants then proceeded to highlight "the strength" of iStar's balance sheet by professing that the Company's loan portfolio: (1) was "mostly senior mortgages"; (2) was "collateralized by high-quality assets"; (3) were assets that iStar could "underwrite, understand and asset manage"; (4) had "unrealized gains throughout the portfolio"; (5) was "extremely well protected"; and (6) were conservatively value assets "a significant discount to replacement cost."

119. In discussing the market challenges facing the Company, Defendant Sugarman distinguished iStar's business risks by stating that the Company did not participate in the problematic residential and structured products markets and "how different we think our business is compared to some of those others that you're going to read about quite a bit in the next year."

120. Defendant Sugarman added, **"when we look at our basis and we look at our positions throughout the portfolio, we can state categorically we have a lot of unrealized gains. I think that surprises some people."**

121. Defendant O'Conner picked up where Defendant Sugarman left off in spreading the message to the investment community about the purported safety of iStar's balance sheet when he referred to a "**33% cushion** between our last dollar of exposure and the value of the underlying collateral" that **"provides for a lot of room for things to go wrong and for us to still be okay.**" Defendant O'Conner also suggested that iStar's loan portfolio was safe because of the conservative bias utilized by the Company in valuing its loan portfolio: "our internal values were some 30% less than what the market was attributing to those deals."

122. Defendant O'Conner also deceptively proclaimed iStar's loss exposure on its loan portfolio was limited due to three factors: (1) the amount of borrower equity in the Company's portfolio; (2) the percentage of senior loans in the Company's portfolio; and (3) amount of the Company's loan loss reserves.

123. Defendant O'Conner then attempted to allay any concerns the investment community might have about iStar's NPLs and watch list assets generally, and its newly acquired Fremont's NPLs and watch list assets in particular, by deceptively stating that while markets had deteriorated, iStar's loan portfolio was "performing pretty much as expected, pretty much as expected." Defendant O'Connor, stated, in pertinent part, as follows:

> Now, the market's gotten worse and there are some challenges we have to deal with, but as far as where we underwrote and how **the portfolio is performing, it's performing pretty much as expected**. [Emphasis added.]

124. Defendant O'Conner then respresented that there were **"no surprises"** with respect to iStar's watch lists and suggested that such assets were safe because they were not concentrated in the most problematic geographic markets:

> And again, **from our perspective, no surprises here, no surprises here, and I would hope that people would come and say, hey, it looks like some of these[geographic] markets, at least right now, that people are very concerned about, we don't have a lot of exposure to**. [Emphasis added.]

125. Defendant O'Conner continued to "spread the message" about the "safety" associated with iStar's balance sheet: "the good news is, as much as the markets are noticeably worse today, materially worse than they were a year ago, our on-balance sheet reserve, our cushion, is significantly greater than it was a year ago."

126. Then, Defendant Rice highlighted the Company's financial performance during the first nine months of 2007, reiterated iStar's 2008 guidance and highlighted the Company's ability to increase dividends from its earnings capacity, stating, in pertinent part as follows:

> As you've heard on our third quarter earnings call, **we've had solid year-to-date financial performance**, with adjusted earnings up 11% and revenues up 45% from the same period in 2006. We announced **2008 adjusted earnings guidance of $4 to $4.20**. And **we continued to deliver strong returns** at reasonable leverage levels. **We announced a 5% increase to our quarterly dividend**, which will be payable in the fourth quarter. And **due to the increase in income that we're receiving from the Fremont portfolio, we'll be declaring a special dividend** in 2007 that should be in the range of $0.15 to $0.30 a share.

127. The statements referenced above in¶¶118-126 were each materially false and misleading and without reasonable basis when made because they failed to disclose and misrepresented the following material adverse facts in existence at the time:

(a) that the "unrealized gains" in iStar's loan portfolio were being offset by ever increasing unrealized losses, including those on iStar's held-to-maturity investments, which from September 30, 2007 through the date of the Investor Day alone, generated losses sufficient to wipe out almost **60%** of all of the income iStar reported from its continuing operations during the first **nine months of 2007**;

(b) that iStar's then existing loan loss reserves were materially insufficient. In fact, iStar needed to increase its loan loss reserves by approximately **$100 million** from the time it

last publicly disclosed its loan loss reserves on September 30, 2007 through the date of the Investor Day, an amount that exceed the entire loan loss provision iStar reported during the first **nine** months of 2007 by almost **40%**. This needed increase in iStar's loan loss reserve effectively wiped out **35%** of all of the income iStar reported from its continuing operations during the first **nine months** of 2007. Accordingly, iStar's loan loss reserves were not "adequate," as Defendants represented;

(c) that the dollar amount of iStar's NPLs and watch list assets had increased materially. In fact, from the time iStar last publicly disclosed the amount of its NPLs and watch list assets on September 30, 2007 through the date of the Investor Day, the dollar amount of iStar's NPLs and watch list assets had increased by approximately **50%** and **100%,** respectively; and

(d) that, as a result of the foregoing, iStar's balance sheet was not "safe"; it faced risks not unlike those faced by non-commercial real estate lenders; its loan portfolio did not have an "embedded cushion," nor was it conservatively valued; its loan portfolio exposure to loss was not limited, its 2008 adjusted earnings guidance was stale and required revision; and any dividend increases or special dividends issued by iStar were one-time in nature not due to "the increase in income that we are receiving from the Fremont portfolio."

128. At the time of the Investor Conference, Defendants **knew** that iStar had an approximate $135 million unrealized loss on two undisclosed debt securities and that GAAP and the Company's accounting policies would require it to record an impairment charge in that approximate amount during the fourth quarter of 2007. In fact, the unrealized loss on such securities was readily determinable by Defendants at the time of the Investor Conference as they "traded" openly in the bond market.

129. Moreover, with only 16 business days remaining in the 2007 fourth quarter at the time of the Investor Conference, Defendants knew or recklessly ignored that iStar was reasonably likely

to record more than a $135 million impairment charge on the two securities during the fourth quarter of 2007 because, as Defendant Rice admitted during iStar's 2007 fourth quarter conference call with investors and securities analysts in February 2008, a "significant" loss in the value of the undisclosed securities existed for "an extended" period of time:

> The accounting for these securities . . . requires that the value be impaired **based on a significant drop in the market value for an extended or other than temporary period of time.** [Emphasis added.]

130. At the time of the Investor Conference, Defendants also **knew** that iStar was reasonably likely to dramatically increase its loan loss reserves and the reported amount of its NPLs and watch list assets by December 31, 2007 because, as Defendant O'Conner represented to investors at the Investor Conference, management monitored iStar's loan portfolio on a "real-time" basis:

> **We can understand the risk in the portfolio, we assessed it at the outset, we continued to monitor that risk throughout the life of the investment so we can actually understand what's going on in our portfolio on a real-time basis.**

Defendant O'Conner also represented:

> **the first thing we do as a company is we devote a lot of people, a lot of assets and a lot of resources to watching the portfolio. We have 135 people that all they do from the time they get up to the time they leave work is watch our portfolio and watch our assets. That's all they do**. [Emphasis added.]

131. In truth and in fact, employees knowledgeable about iStar's loan portfolio stated that at the time of the Investor Conference, economic and financial market conditions were having a devastating effect on iStar's financings. For example:

- a former Fremont loan underwriter stated that business in her/his office essentially stopped in 2007;
- a former Fremont Loan Closer stated lending activity in her/his office came to a screeching halt and collapsed in 2007;
- a former iStar Senior Loan Associate stated several loans iStar acquired from Fremont, including, Illinois Tollway Oasis, were proceeding to default at or before

the Investor Conference and that iStar extended loan maturity dates to avoid having to make adverse disclosures about them. This former iStar employee also stated that the Company's management was aware of iStar's problem loans, including bonds issued by Linens 'n Things, Inc., because iStar's Investment Committee conducted twice-weekly conference calls with numerous Company employees; and

- a former Fremont Senior Vice President stated that iStar's Investment Committee convened conference calls each Monday and Thursday to monitor the loan portfolio with the Monday calls being attended by the Company's loan originators and the Thursday calls attended asset mangers.

132. Accordingly, Defendants' deceptive Investor Conference presentations were materially false and misleading half-truths that were deliberately designed to inflate the value of the Company's stock in advance of the Secondary Offering. Defendants timed the Secondary Offering so that it was priced before the Company announced its disappointing 2007 fourth quarter financial results in order to maximize the amount of money they could raise in the Secondary Offering.

**Additional Scienter Allegations**

133. As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company (or in their own name) on Investor Conference were materially false and misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding iStar, their control over, and/or receipt and/or modification of iStar's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

134. Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the

knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

135. As alleged herein, at the time of the Investor Conference and at the time of the Secondary Offering, Defendants were aware of then true financial condition of iStar, that the value of the Company's loan portfolio had declined precipitously since the Company last reported its financial results as of September 30, 2007 and that, as a result, it was reasonably likely that iStar, with only several days remaining before its December 31, 2007 fourth quarter and year end, would report charges against earnings in hundreds of millions of dollars during the period ending December 31, 2007.

136. Defendants have admitted that they closely monitored the Company's loan portfolio and had an intimate understanding of the most risky loans in iStar's portfolio. Indeed, **Defendant O'Conner admitted at the Investor Conference that the decisions about iStar's risky 4 and 5 rated loans "isn't left to somebody that's out in the field - - It's done by the senior people in this Company, and I think that's a significant differentiator in our business**." Defendant O'Conner also indicated that management discussed its high risk loans with a 135-person risk management team and that such discussions occurred "**weekly, if not more."**

137. Thus, Defendants pushed forward with the Secondary Offering when they **knew** that the value of the Company's loan portfolio had declined precipitously since the time that the Company last reported its financial results on September 30, 2007. Rather than updating the marketplace during the Investor Conference about the true state of the Company's business, Defendants permitted the Secondary Offering to occur at a price that was based upon an inaccurate perception of the Company's financial performance.

138. Defendants timed the Secondary Offering so that it was priced before the announcement of iStar's disappointing 2007 fourth quarter results in order to maximize the amount of money that the Company could raise in the Secondary Offering. Given Defendants' knowledge of the declining financial condition of iStar and the positive statements, detailed above, made contemporaneously with that knowledge, Defendants' materially false and/or misleading statements alleged herein were made willfully and caused iStar common stock to trade at artificially inflated prices.

139. The credit crisis that existed during the Class Period was particularly troubling to lenders like iStar that are structured as REITs. Pursuant to the tax laws, REITs are required to return much of their cash to shareholders. Accordingly, iStar's ready access to capital is vital if it is to possess the liquidity necessary to issue mortgage loans.

140. Defendants knowingly engaged or consciously ignored the fraud alleged herein to provide it with ready access to much needed capital at a time when capital raising in the marketplace was extremely unfavorable. Defendants used the proceeds raised in the Secondary Offering to pay down a $1.9 billion short-term credit facility scheduled to come due in June 2008.

141. Defendants also knowingly engaged or consciously ignored the fraud alleged herein because they were troubled about rating downgrades since iStar's rating agencies were concerned about the levels of the Company's debt and capital.

142. The scienter of the Individual Defendants is underscored by the Sarbanes-Oxley mandated certifications of Defendants Sugarman and Rice, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about iStar was made known to them and that the Company's disclosure related controls were operating effectively.

143. The Individual Defendants, because of their positions with iStar, controlled the contents of the Company's public statements during the Class Period. Each Individual Defendant was provided with or had access to copies of the presentations alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of the Individual Defendants is responsible for the accuracy of iStar's corporate statements and are therefore responsible and liable for the representations contained therein.

**Loss Causation/Economic Loss**

144. During the Class Period, as detailed herein, Defendants engaged in a course of conduct and a scheme to deceive the market that artificially inflated iStar's stock price and operated as a fraud or deceit on Class Period purchasers of iStar common stock by misrepresenting the Company's then current state of affairs. Defendants achieved this façade by making misrepresentations about the Company's business and loan portfolio. As detailed above, when Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of iStar stock declined as the prior artificial inflation came out of the price of iStar stock. As a result of their purchases of iStar common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

145. By improperly concealing their conduct, Defendants presented a misleading picture of iStar's business and prospects. Thus, instead of truthfully disclosing the risks and uncertainties facing iStar, Defendants caused iStar to conceal the adverse developments associated with its

lending activities. These actions caused iStar common stock to trade at artificially inflated prices throughout the Class Period and until the truth was revealed to the market.

146. Defendants' false and misleading statements had the intended effect and caused iStar's stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $32.75 per share.

147. On February 28, 2008, when iStar announced that its fourth quarter financial results were impacted by $134.9 million of charge associated with the "impairment of two credits" and a $113 million charge associated with an increase in its loan loss reserves, iStar's common stock dropped by approximately 12% to $20.19 per share. Thereafter, in response to such announcements, the price of iStar stock declined another 30 % over the ensuing five trading days to $13.98 per share on March 6, 2008.

148. The decline in iStar's stock price at the end of the Class Period was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the decline in the price of iStar stock negates any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.

149. The economic loss, *i.e.*, damages, suffered by Plaintiffs and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate iStar's stock price and the subsequent significant decline in the value of iStar's stock when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

**Applicability of Presumption of Reliance:
Fraud on the Market Doctrine**

150. At all relevant times, the market for iStar common stock was an efficient market for the following reasons, among others:

(a) iStar common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and liquid global market;

(b) as a public company, iStar filed periodic public reports with the SEC;

(c) iStar regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) iStar was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

151. As a result of the foregoing, the market promptly digested current information regarding iStar from publicly available sources and reflected such information in the price of iStar stock. Under these circumstances, all purchasers of iStar common stock during the Class Period suffered similar injury through their purchase of iStar common stock at artificially inflated prices and a presumption of reliance applies.

**No Safe Harbor**

152. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as “forward-looking statements”

when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of iStar who knew that those statements were false when made.

153. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**COUNT IV**

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants iStar, Sugarman, Rice and O'Conner**

154. Plaintiffs incorporate herein ¶¶1-153 by reference.

155. In this Count, the term "Defendants" refers only to Defendants iStar, Sugarman, Rice and O'Conner.

156. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

157. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of iStar common stock during the Class Period.

158. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for iStar common stock. Plaintiffs and the Class would not have purchased iStar common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

159. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of iStar common stock during the Class Period.

**COUNT V**

**Violation of Section 20(a) of the Exchange Act**
**Against Defendants Sugarman, Rice and O'Conner**

160. Plaintiffs incorporate herein ¶¶1-159 by reference.

161. In this Count, the term "Defendants" refers only to Defendants Sugarman, Rice and O'Conner.

162. Defendants Sugarman, Rice and O'Conner acted as controlling persons of iStar within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions and their power to control public statements about iStar, Defendants Sugarman, Rice and O'Conner had the

had the power and ability to control the actions of iStar and its employees. By reason of such conduct, Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

A. declaring this action to be a plaintiff class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

B. awarding Plaintiffs and other members of the Class damages together with interest thereon;

C. with respect to Count II, ordering that the Secondary Offering be rescinded;

D. awarding Plaintiffs and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

E. awarding Plaintiffs and other members of the Class such other and further relief as may be just and proper under the circumstances.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

DATED: February 2, 2009

COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN

SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

ABRAHAM FRUCHTER & TWERSKY LLP
JACK G. FRUCHTER
One Pennsylvania Plaza, Suite 2805
New York, NY 10119
Telephone: 212/279-5050
212/279-3655 (fax)

Co-Lead Counsel for Plaintiffs

ROBERT M. CHEVERIE & ASSOCIATES
GREGORY CAMPORA
Commerce Center One
333 E. River Drive, Suite 101
East Hartford, CT 06108
Telephone: 860/290-9610

Additional Counsel for Plaintiff

# CERTIFICATE OF SERVICE

I, Samuel H. Rudman, hereby certify that on February 2, 2009, I caused a true and correct copy of the attached:

> Consolidated Amended Class Action Complaint for Violations of Federal Securities Laws

to be served by first-class mail to all counsel on the attached service list.

SAMUEL H. RUDMAN

iSTAR FINANCIAL (LEAD)
Service List - 1/6/2009 (08-0083)
Page 1 of 1

**Counsel For Defendant(s)**

Matthew D. Parrott
Katten Muchin Rosenman LLP
575 Madison Avenue
New York, NY 10022
212/940-8800
212/940-8776(Fax)

David H. Kistenbroker
Theresa L. Davis
Katten Muchin Rosenman LLP
525 W. Monroe Street, Suite 1600
Chicago, IL 60661-3693
312/902-5200
312/902-1061(Fax)

**Counsel For Plaintiff(s)**

Jack G. Fruchter
Abraham, Fruchter & Twersky
One Pennsylvania Plaza, Suite 2805
New York, NY 10119
212/279-5050
212/279-3655(Fax)

Samuel H. Rudman
David A. Rosenfeld
Mario Alba, Jr.
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY 11747
631/367-7100
631/367-1173(Fax)

Ramzi Abadou
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
619/231-1058
619/231-7423(Fax)

Gregory Campora
Robert M. Cheverie & Associates
Commerce Center One
333 E. River Drive, Suite 101
East Hartford, CT 06108
860/290-9610