UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————x

CITILINE HOLDINGS, INC., Individually 　:
and On Behalf of All Others Similarly Situated,　　:　　Civil Action No. 1:08-cv-03612
　　　　　　　　　　　　　　　　　　　:　　**(Consolidated)**
　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　Plaintiff,　　　　:
　　vs.　　　　　　　　　　　　　　　:　　<u>CLASS ACTION</u>
　　　　　　　　　　　　　　　　　　　:
ISTAR FINANCIAL INC., et al.,　　　　　:
　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　Defendants.　　:

———————————————————————x

**MEMORANDUM OF LAW**
**IN SUPPORT OF THE MOTION OF DEFENDANTS**
**CITIGROUP GLOBAL MARKETS INC., J.P. MORGAN SECURITIES INC.,**
**WACHOVIA CAPITAL MARKETS, LLC, BANC OF AMERICA SECURITIES LLC,**
**DEUTSCHE BANK SECURITIES INC., AND UBS SECURITIES LLC**
**TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

SIDLEY AUSTIN LLP

ATTORNEYS FOR DEFENDANTS
CITIGROUP GLOBAL MARKETS INC., J.P. MORGAN SECURITIES INC., WACHOVIA CAPITAL
MARKETS, LLC, BANC OF AMERICA SECURITIES LLC, DEUTSCHE BANK SECURITIES INC., AND
UBS SECURITIES LLC

787 SEVENTH AVENUE
NEW YORK, NEW YORK 10019
(212) 839-5300

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................... ii

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF FACTS ..................................................................................... 3

ARGUMENT ......................................................................................................... 7

I.    THE CLAIMS AGAINST THE UNDERWRITER DEFENDANTS ARE
TIME-BARRED. ........................................................................................ 9

      A.    Plaintiffs Were Aware Of Alleged Facts Giving Rise To Their
Claims Against The Underwriter Defendants More Than One Year
Before They Filed The CAC. ................................................... 12

      B.    Plaintiffs' Claims Against The Underwriter Defendants Do Not
Relate Back To The Dates Of Earlier Complaints. ................... 16

II.    PLAINTIFFS FAIL TO PLEAD THE SECTION 11 AND 12 CLAIMS
AGAINST THE UNDERWRITER DEFENDANTS WITH
PARTICULARITY. ................................................................................ 18

CONCLUSION ................................................................................................... 22

i

# TABLE OF AUTHORITIES

**CASES**                                                                                     **PAGE(S)**

Addeo v. Braver,
  956 F. Supp. 443 (S.D.N.Y. 1997) ................................................................................. 11

ATSI Comme'ns Inc. v. Shaar Fund, Ltd.,
  493 F.3d 87 (2d Cir. 2007) ..................................................................................... 7, 8

Bell Atlantic Corp. v. Twombly,
  550 U.S. 544 (2007) .................................................................................................. 8

Borsellino v. Goldman Sachs Group, Inc.,
  477 F.3d 502 (7th Cir. 2007) ................................................................................... 21

Brimo v. Corporate Express, Inc.,
  229 F.3d 1135, 2000 WL 1506083 (2d Cir. Oct. 6, 2000) (unpublished opinion) ...... 10, 11, 16

Caiafa v. Sea Containers Ltd.,
  525 F. Supp. 2d 398 (S.D.N.Y. 2007) ...................................................................... 21

Chill v. Gen. Elec. Co.,
  101 F.3d 263 (2d Cir. 1996) ..................................................................................... 20

Cornwell v. Robinson,
  23 F.3d 694 (2d Cir. 1994) ....................................................................................... 17

Cortec Indus., Inc. v. Sum Holding L.P.,
  949 F.2d 42 (2d Cir. 1991) ......................................................................................... 7

Dodds v. Cigna Sec., Inc.,
  12 F.3d 346 (2d Cir.1993) .............................................................................. 10, 11, 15

Ezra Charitable Trust v. Frontier Ins. Group, Inc.,
  No. 00 Civ. 5361, 2002 WL 87723 (S.D.N.Y. Jan. 23, 2002) ................................. 16

Goldin Assocs., L.L.C. v. Donaldson, Lufkin & Jenrette Sec. Corp., 00 Civ. 8688, 2003
  U.S. Dist. LEXIS 16798 (S.D.N.Y. Sept. 25, 2003) .................................................. 8

GVA Market Neutral Master Ltd. v. Versus Capital Partners Offshore Fund, Ltd.,
  580 F. Supp. 2d 321 (S.D.N.Y. 2008) .......................................................... 8, 10, 11

In re Alstom SA Sec. Litig.,
  406 F. Supp. 2d 402 (S.D.N.Y. 2005) ......................................................... 10, 11, 16, 17

In re Blech Sec. Litig.,
    961 F. Supp. 569 (S.D.N.Y. 1997) ................................................................20, 22

In re Exxon Mobil Corp. Sec. Litig.,
    500 F.3d 189 (3d Cir. 2007) ....................................................................... 10

In re Initial Public Offering Sec. Litig.,
    227 F.R.D. 65 (S.D.N.Y. 2004), rev'd on other grounds, 471 F.3d 24 (2d Cir. 2006) ............ 8

In re JP Morgan Chase Sec. Litig.,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005) ........................................................22

In re Marsh & McLennan Cos. Sec. Litig.,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006) ........................................................20

In re Merrill Lynch & Co. Inc. Research Reports Sec. Litig.,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003) ........................................................ 8

In re Openwave Sys. Secs. Litig.,
    528 F. Supp. 2d 236 (S.D.N.Y. 2007) ................................................10, 11, 12

In re WorldCom, Inc. Sec. Litig.,
    294 F. Supp. 2d 431 (S.D.N.Y. 2003), rev'd on other grounds, 496 F.3d 245 (2d Cir. 2007)………………………………………………………………………..7

Kinsey v. Cendant Corp., 04 Civ. 0582, 2004 U.S. Dist. LEXIS 23059 (S.D.N.Y. Nov. 16, 2004)...................................................................................... 8

Ladmen Partners, Inc. v. Globalstar, Inc., 07 Civ. 0976, 2008 U.S. Dist. LEXIS 76670 (S.D.N.Y. Sept. 30, 2008)............................................................19, 20, 21

LC Capital Partners, L.P. v. Frontier Ins. Group, Inc.,
    318 F.3d 148 (2d Cir. 2003) .....................................................................11

Miller v. Lazard, Ltd.,
    473 F. Supp. 2d 571 (S.D.N.Y. 2007) ........................................................19

Rey-Willis v. Citibank, N.A.,
    No. 03 Civ. 2006, 2004 WL 315267 (S.D.N.Y. Sept. 17, 2004)............................21

Rombach v. Chang,
    355 F.3d 164 (2d. Cir 2004) ..............................................................18, 20

San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,
    75 F.3d 801 (2d Cir. 1996) ..................................................................7

Scone Invs., L.P. v. American Third Market Corp., 97 Civ. 3802, 1998 U.S. Dist. LEXIS 5903 (S.D.N.Y. Apr. 27, 1998) ........................................................22

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
    127 S. Ct. 2499 (2007)................................................................................................7

**STATUTES**                                                  **PAGE(S)**

15 U.S.C. § 77m .............................................................................................1, 10

Fed. R. Civ. P. 12(b)(1) ..........................................................................................1

Fed. R. Civ. P. 12(b)(6) ..........................................................................................1

Fed. R. Civ. P. 9(b).........................................................................................*passim*

Fed. R. Civ. P. 15(c)(1)(C) .....................................................................................16

NY1 6887149

Defendants Citigroup Global Markets Inc., J.P. Morgan Securities Inc., Wachovia Capital

Markets, LLC, Banc of America Securities LLC, Deutsche Bank Securities Inc., and UBS

Securities LLC (collectively, "Underwriter Defendants") respectfully submit this memorandum

of law in support of their motion to dismiss the Consolidated Amended Class Action Complaint

(the "CAC") of Lead Plaintiffs Plumbers Union Local No.12 Pension Fund and Citiline

Holdings, Inc. (collectively, "Plaintiffs"), pursuant to Rules 9(b), 12(b)(1), and 12(b)(6) of the

Federal Rules of Civil Procedure and Section 13 of the Securities Act of 1933 (the "Securities

Act), 15 U.S.C. §77m.

## PRELIMINARY STATEMENT

The CAC must be dismissed as to the Underwriter Defendants because Plaintiffs cannot

trace their shares to an offering – here, a secondary offering made at a time when previously

issued shares were actively traded – that was in any way marked by actionable misstatements or

omissions.  Moreover, their claims against the Underwriter Defendants are untimely and are not

pleaded with sufficient particularity.  For all these reasons, the CAC must be dismissed.

Plaintiffs' CAC focuses almost entirely on the activities of iStar Financial Inc. ("iStar")

and the individual defendants (collectively, "iStar Defendants"), and contains nothing more than

generic and conclusory allegations about the Underwriter Defendants – which were not named in

any previous complaints – and their role in iStar's secondary offering.  Indeed, the bulk of the

CAC alleges that fraudulent statements were made at iStar's annual December 6, 2007 Investor

Day Conference, which was completely unrelated to iStar's secondary offering, and none of

those allegations has anything to do with the Underwriter Defendants.  Nonetheless, Plaintiffs

attempt to bring claims under Sections 11 and 12(a)(2) of the Securities Act against the

Underwriter Defendants solely based on their role in iStar's December 2007 secondary offering.

Plaintiffs clump the Underwriter Defendants along with the other defendants and conclusorily

1

allege that all defendants knew but failed to disclose, among other things, that iStar's held-to-maturity investments and the credit quality of iStar's loan portfolio had experienced material declines between the close of the third-quarter and the time of the secondary offering. What Plaintiffs conveniently omit from their allegations, however, is that there was a negative trend in the overall economy during this time, particularly in the global credit and real estate markets in which iStar – a finance company whose lending business consists of loans on commercial real estate – was involved.

As addressed in the iStar Defendants' motion, Plaintiffs' Section 11 and Section 12 claims should be dismissed for a number of reasons. As a threshold matter, Plaintiffs do not have standing to assert a Section 11 claim because they have not adequately pled that they can trace their shares to the secondary offering. Nor can they assert a Section 12(a)(2) claim, because they cannot establish that they purchased their shares directly in the offering. Moreover, the CAC is a classic example of hindsight pleading, which is not actionable as a matter of law. Contrary to Plaintiffs' allegations, the public was on notice prior to the secondary offering that unrealized losses on iStar's debt securities were materially increasing, that iStar's loan loss reserve was materially increasing and would continue to materially increase, and that the credit quality of iStar's loan portfolio was decreasing and would continue to materially decrease. Further, the offering documents included numerous, explicit risk disclosures that warned investors of the very trends that led to the declines that Plaintiffs allege were omitted, thereby rendering the alleged omissions not actionable.

The Section 11 and 12 claims against the Underwriter Defendants should be dismissed for two additional independent reasons. First, Plaintiffs' claims against the newly-added Underwriter Defendants are time-barred because Plaintiffs were aware of or at least on inquiry notice of the facts underlying their claims by the time of the December 2007 secondary offering

and did not assert claims against the Underwriter Defendants until they filed the CAC in February 2009, well more than one year later.  Second, despite the fact that Plaintiffs do not assert any claims for violations of the Securities Exchange Act of 1934 (the "Exchange Act") against the Underwriter Defendants, Plaintiffs clump the Underwriter Defendants together with the iStar Defendants in alleging what all defendants "knew" but failed to disclose in the Registration Statement and Prospectuses.  Thus, Plaintiffs' claims against the Underwriter Defendants sound in fraud and must be pled with the particularity required by Rule 9(b).  Plaintiffs' bare-bones, conclusory pleading falls far short of this standard, as the CAC does not contain one single allegation that in any way connects the Underwriter Defendants – as a group or individually – to any alleged misstatement in the secondary offering materials.  Moreover, Plaintiffs do not even attempt to particularize their allegations about the Underwriter Defendants to specific companies, let alone to specific individuals within them.  For all of these reasons, Plaintiffs' claims against the Underwriters must be dismissed.

## STATEMENT OF FACTS

To avoid repetition, the Underwriter Defendants incorporate by reference and adopt the factual background set forth in the iStar Defendants' memorandum of law ("iStar Mem.")  (See iStar Mem. at 1-5.)

Plaintiff Citiline Holdings, Inc. filed its original complaint in this action on April 15, 2008 against defendants iStar, Jay Sugarman, Jay S. Nydick, and Catherine D. Rice, alleging violations of Sections 11, 12(a)(2), and 15 of the Securities Act in connection with iStar's secondary offering.  No Underwriter Defendants were named in the original complaint, despite the fact that Citiline Holdings, Inc. knew the identity of the underwriters of the secondary offering and had the opportunity to name them.  And Plaintiffs have learned no relevant facts, let alone facts related to the Underwriter Defendants, since the time that the original complaint was

3

filed. After two additional complaints were filed on April 16, 2008 and April 24, 2008, both of which also did not include claims against the Underwriter Defendants,[1] the April 24, 2008 complaint was consolidated with this class action on November 17, 2008.[2] It was not until February 2009 – almost one year after the original complaint's filing – that Plaintiffs filed their CAC and added the Underwriter Defendants to this case for the first time.

Although prolix – covering sixty pages and 162 paragraphs – the CAC includes very few allegations concerning the newly-added Underwriter Defendants. While Plaintiffs assert that the iStar Defendants violated the Exchange Act in connection with statements made at iStar's December 6, 2007 Investor Day Conference (which was wholly unrelated to iStar's secondary offering) (CAC ¶¶ 29-38, 116-62), Plaintiffs only bring claims for violations of Sections 11 and 12(a)(2) of the Securities Act against the Underwriter Defendants (along with the other defendants), based on conclusory allegations that the Registration Statement, Prospectus, and Prospectus Supplements for iStar's secondary offering were materially false and misleading (CAC ¶¶ 39-115).

The CAC specifically mentions the Underwriter Defendants in only five of its 162 paragraphs and even then in the most cursory and conclusory terms. The CAC alleges that the Underwriter Defendants "served as underwriters for the Secondary Offering" and that they "purchased at least 6,912,000 [shares of] iStar common stock at the public offering price, less an underwriting discount, in the Secondary Offering." (CAC ¶¶ 13, 106.) With respect to the Underwriter Defendants' conduct, Plaintiffs assert conclusorily that none of the Underwriter Defendants "made a reasonable investigation or possessed reasonable grounds for the belief that

---

[1] The April 16, 2008 complaint alleged derivative claims and focused on certain other individual defendants' alleged violations of Sections 20(a) and 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as well as their alleged breaches of fiduciary duty. The April 24, 2008 complaint alleged violations of Sections 11, 12(a)(2), and 15 of the Securities Act.
[2] The April 16, 2008 complaint was voluntarily dismissed.

the statements described . . . in the Registration Statement, Prospectus or Prospectus Supplements were true, were without omission of any material facts, and/or were not misleading." (CAC ¶ 97.) Plaintiffs further allege:

> The Underwriter Defendants participated in the preparation and dissemination of the defective and inaccurate Prospectus and Prospectus Supplements for their own financial benefit. But for their participation in the Secondary Offering, including their solicitation as set forth herein, the Secondary Offering could not and would not have been accomplished. Specifically, the Underwriter Defendants:
>
> (a) made the decision to conduct the Secondary Offering and do it at the price set forth in the offering documents. The Underwriter Defendants drafted, revised and/or approved the Prospectus and Prospectus Supplement. The Prospectus was calculated to create interest in iStar common stock and was widely distributed by or on behalf of the Underwriter Defendants for that purpose;
>
> (b) finalized the Prospectus and caused it to become effective; and
>
> (c) conceived and planned the Secondary Offering and orchestrated all activities necessary to affect the sale of these securities to the investing public, by issuing securities, promoting the securities and supervising their distribution and ultimate sale to the investing public.

(CAC ¶ 107.) These allegations against the Underwriter Defendants do no more than define their standard and typical role as underwriters in the Secondary Offering.

As set forth more fully in the iStar Defendants' memorandum of law, Plaintiffs allege that the May 1, 2007 Registration Statement, which incorporated the October 9, 2007 Prospectus and December 13, and 17, 2007 Prospectus Supplements, issued in connection with iStar's secondary offering was materially false and misleading because it (1) failed to disclose "material changes" (CAC ¶¶ 44-67); (2) included misleading risk disclosures (CAC ¶¶ 68-70); and (3) included inaccurate financial statements (CAC ¶¶ 71-82). With respect to the purportedly undisclosed material changes, Plaintiffs contend that defendants failed to disclose that, during the time period between the close of the third-quarter on September 30, 2007 and the time of the secondary offering on or about December 14, 2007, iStar experienced (1) a material decline in

debt security values; (2) a material increase in loan losses; and (3) a material decline in credit quality.  (CAC ¶¶ 44-67.)

With respect to the alleged material decline in debt security values, Plaintiffs allege that "the amount of the unrealized losses on iStar's held-to-maturity investments increased by approximately $60 million" and that iStar "incurred material incremental losses on its undisclosed Linens 'n Things ("LNT") and WCI Communities ("WCI") debt securities."  (CAC ¶¶ 47, 50.)  With respect to the alleged material increase in loan losses, Plaintiffs allege that defendants "failed to disclose the approximate $110 million incremental increase in iStar's loan loss reserves."  (CAC ¶ 61.)  As for the alleged material decline in credit quality, Plaintiffs claim that defendants failed to disclose the increase in the carrying value of iStar's Non-Performing Loans and watch list assets.  (CAC ¶¶ 66-67.)  Plaintiffs' claims concerning iStar's risk disclosures and financial statements are essentially a variation on Plaintiffs' other claims. Plaintiffs contend the risk disclosures were misleading because they did not adequately discuss iStar's corporate loan and debt portfolio problems (CAC ¶ 69) and that the financial statements were inaccurate because they did not discuss declines in iStar's loan portfolio (CAC ¶ 78).

Presented with no conceivable allegations of specific misstatements or misconduct by the Underwriter Defendants, Plaintiffs clump the Underwriter Defendants together with the other defendants in asserting the above allegations, and claim that the Underwriter Defendants prepared and disseminated the purportedly defective and inaccurate Prospectus and Prospectus Supplements for their own financial benefit.  (CAC ¶¶ 52, 60, 67, 107.)  Plaintiffs fail to make any factual allegations particularized to specific Underwriter Defendants, let alone to specific individuals within them.  Indeed, Plaintiffs allege that all defendants had the same knowledge of undisclosed, adverse facts in making the misstatements in the secondary offering materials. Specifically, Plaintiffs allege that:

6

- "defendants knew that iStar's held-to-maturity investments had experienced a material decline in the [sic] value between September 30, 2007 and the time of the Secondary Offering" (CAC ¶ 52);

- "defendants knew that iStar's loan portfolio had experienced material decline in value between September 30, 2007 and the time of the Secondary Offering" (CAC ¶ 60); and

- "defendants knew that between September 30, 2007 and the time of the Secondary Offering . . . the credit quality of iStar's loan portfolio declined precipitously causing a sharp spike in the Company's NPLs and watch list assets by the time of the Secondary Offering" (CAC ¶ 67).

Contrary to Plaintiffs allegations, and as fully set forth in the iStar Defendants' memorandum of law, iStar's secondary offering materials contained meaningful risk and other disclosures, which addressed the negative trends in the overall economy and growth in iStar's portfolio.  (See iStar Mem. at 4-5, 18-21.)[3]  Moreover, the public was well aware prior to the secondary offering that the value of iStar's held-to-maturity investments was declining, that iStar had repeatedly increased its reserve for loan losses, and that iStar had experienced a dramatic increase in its non-performing loans.  (See iStar Mem. at 14-18.)

## ARGUMENT

The Underwriter Defendants incorporate by reference and adopt the arguments set forth in the iStar's Defendants' memorandum of law, as if fully set forth herein, to the extent those

---

[3] The Court may consider the full text of documents that are incorporated by reference into the complaint and documents that form the basis of plaintiffs' allegations, if the documents are "integral" to the complaint, as well as public disclosure documents filed with the Securities and Exchange Commission and other public documents, even if the documents have not been appended by the plaintiffs.  (See iStar Mem. at 4-5 n.8, 16 n.19); see also Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2509 (2007); ATSI Commc'ns Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007); San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 808-09 (2d Cir. 1996); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991).

arguments apply to the claims asserted against the Underwriter Defendants.  (See iStar Mem. at

6-34.)[4]

       As fully explained in the iStar Defendants' memorandum of law, Plaintiffs' claims under

Sections 11 and 12(a)(2) of the Securities Act must be dismissed for the following reasons:

- Plaintiffs do not have standing to assert a Section 11 claim because they have not adequately pled that they can trace their shares to the secondary offering.  (See iStar Mem. at 8-9.)  Lead Plaintiffs' certifications do not establish that either of them purchased in the secondary offering and due to the large number of shares of iStar common stock issued prior to the secondary offering, it is legally impossible for Plaintiffs to trace their shares to that offering.  (See id. & n.14); see also In re Initial Public Offering Sec. Litig., 227 F.R.D. 65, 117-18 (S.D.N.Y. 2004) (noting that it is "virtually impossible to trace shares to a registration statement once additional unregistered shares have entered the market.  Even where the open market is predominantly or overwhelmingly composed of registered shares, plaintiffs are not entitled to a presumption of traceability."), rev'd on other grounds, 471 F.3d 24 (2d Cir. 2006).

- Plaintiffs cannot bring a Section 12(a)(2) claim on behalf of individuals who did not purchase securities *directly* in the secondary offering at issue.  (See iStar Mem. at 9-10.)

- Plaintiffs have not pled sufficient facts to establish standing to bring a Section 12(a)(2) claim because they failed to allege that they purchased shares directly from any of the defendants.  (See id. at 10.)  Notably, Plaintiffs do not even allege that the underwriters named as defendants were the only underwriters for the secondary offering.  See In re Merrill Lynch & Co. Inc. Research Reports Sec. Litig., 272 F. Supp. 2d 243, 255

---

[4] As discussed in the iStar Defendants' memorandum of law, on a Rule 12(b)(6) motion, "[d]ismissal is proper when the plaintiff fails to plead the basic elements of a cause of action." Goldin Assocs., L.L.C. v. Donaldson, Lufkin & Jenrette Sec. Corp., 00 Civ. 8688, 2003 U.S. Dist. LEXIS 16798, at *6 (S.D.N.Y. Sept. 25, 2003) (quotation omitted).  To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007); see also ATSI Commc'ns Inc., 493 F.3d at 98 (applying Twombly in securities context); GVA Market Neutral Master Ltd. v. Versus Capital Partners Offshore Fund, Ltd., 580 F. Supp. 2d 321, 327 (S.D.N.Y. 2008) (same).  Although Plaintiffs' allegations are accepted as true for the purposes of the motion, "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.  A plaintiff's obligation . . . requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. Moreover, a court is not required to credit factual allegations that are contradicted by statements in the complaint or by documents on which the complaints rely.  See Kinsey v. Cendant Corp., 04 Civ. 0582, 2004 U.S. Dist. LEXIS 23059, at *21-22 (S.D.N.Y. Nov. 16, 2004); (iStar Mem. at 20 n.22).

(S.D.N.Y. 2003) (dismissing claim where plaintiff did not allege "that the [shares were] sold exclusively through [defendant's] brokers").

- Plaintiffs failed to allege any actionable misstatements or omissions of information because (1) defendants complied with their duty to disclose known trends and uncertainties impacting iStar at the time of the secondary offering; (2) iStar's numerous risk disclosures repeatedly warned investors that the deterioration in the general economy and in real estate values would continue to negatively impact iStar's loan loss projections, the credit quality of its loan portfolio, and the value of its debt securities; and (3) defendants did not have a duty to conduct a mid-quarter accounting analysis to quantify the impact of fully disclosed business trends on iStar at the time of the secondary offering. (See iStar Mem. at 11-23.)

- Plaintiffs have not pled facts demonstrating that any defendant knew the allegedly omitted information at the time the statements in the secondary offering materials were made. (See id. at 28-33.)

In addition, the Section 11 and 12(a)(2) claims against the Underwriter Defendants should be dismissed because they are time-barred and have not been pleaded with the particularity required by Rule 9(b).

## I.    THE CLAIMS AGAINST THE UNDERWRITER DEFENDANTS ARE TIME-BARRED.

As an initial matter, for the reasons discussed herein and in the iStar Defendants' memorandum of law, Plaintiffs' allegations are insufficient to state a claim against the Underwriter Defendants.  In any event, even if Plaintiffs' allegations did sustain a claim, Plaintiffs were aware – or at least on inquiry notice – of the facts supposedly underlying their claim more than one year prior to adding the Underwriter Defendants to this case on February 2, 2009.  Thus, Plaintiffs' claims against the Underwriter Defendants are barred by the applicable one-year statute of limitations.

Under Section 13 of the Securities Act, no action shall be maintained to enforce liability under Section 11 or Section 12(a)(2) "unless brought within one year after the discovery of the untrue statement or omission or after such discovery should have been made by the exercise of

reasonable diligence." 15 U.S.C. § 77m.[5] Thus, the applicable one-year limitations period

begins to run either upon actual notice of the underlying claim or upon constructive inquiry

notice. Indeed, Section 13 expressly bars claims raised more than one year after "discovery [of

the untrue statement or omission] should have been made by the exercise of reasonable

diligence." Id. This duty of inquiry arises "when the circumstances would suggest to an investor

of ordinary intelligence the probability" that there is a possible cause of action. Dodds v. Cigna

Sec., Inc., 12 F.3d 346, 350 (2d Cir.1993); see also GVA Market Neutral Master Ltd. v. Versus

Capital Partners Offshore Fund, Ltd., 580 F. Supp. 2d 321, 327 (S.D.N.Y. 2008); In re

Openwave Sys. Secs. Litig., 528 F. Supp. 2d 236, 245 (S.D.N.Y. 2007). The circumstances

giving rise to the duty to inquire are commonly referred to as "storm warnings." See Dodds, 12

F.3d at 350; Openwave, 528 F. Supp. 2d at 245. Information that may constitute sufficient

"storm warnings" to place an investor on inquiry notice of a claim includes:

> 'any financial, legal, or other data, including public disclosures in
> the media about the financial condition of the corporation . . .
> available to the plaintiff providing him with sufficient storm
> warnings to alert a reasonable person to the probability that there
> were either misleading statements or significant omissions
> involved in the sale of securities.'

Brimo v. Corporate Express, Inc., 229 F.3d 1135, 2000 WL 1506083, at *2 (2d Cir. Oct. 6, 2000)

(citation omitted) (analyzing inquiry notice with respect to Exchange Act claim) (unpublished

---

[5] Section 804 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") does not lengthen Section 13's limitations period for Section 11 and 12(a)(2) claims, regardless of whether those claims sound in fraud. See, e.g., In re Alstom SA Sec. Litig., 406 F. Supp. 2d 402, 412-18 (S.D.N.Y. 2005) (noting that every court that has ruled on the issue of whether Sarbanes-Oxley lengthened the statute of limitations for Section 11 and 12(a)(2) claims has found that it did not and citing "the overwhelming body of judicial opinion addressing this point"); see also In re Exxon Mobil Corp. Sec. Litig., 500 F.3d 189, 198 (3d Cir. 2007) (holding that Sarbanes-Oxley did not lengthen the statute of limitations for Section 14(a) claims that sound in fraud). To the Underwriter Defendants' knowledge, *every court* in this Circuit to have considered whether Section 804 applies to Section 11 and 12(a)(2) claims has held that it does not. See Alstom, 406 F. Supp. 2d at 412-14 & n.5 (holding that the statute of limitations period in Section 13 of the Securities Act, rather than that contained in Sarbanes-Oxley Section 804, applies to Section 11 and 12(a)(2) claims and collecting cases).

opinion); see In re Alstom SA Sec. Litig., 406 F. Supp. 2d 402, 421 (S.D.N.Y. 2005) (quoting

Brimo).  Moreover, plaintiffs are charged with knowledge of public information at the time of its

release.  See, e.g., Dodds, 12 F.3d at 350 ("[t]he means of knowledge are the same thing in effect

as knowledge itself") (citation omitted).

      In determining whether a plaintiff was under a duty to investigate, the "question is not

whether the materials suggested the *full extent* of defendant's deceit; the question is whether the

materials suggested that there were *any* material misrepresentations."  Addeo v. Braver, 956 F.

Supp. 443, 450 (S.D.N.Y. 1997) (determining inquiry notice on motion for summary judgment)

(emphasis added); see Dodds, 12 F.3d at 352 ("An investor does not have to be on notice of the

entire fraud being perpetrated to be on inquiry notice").  The Second Circuit has acknowledged

that when facts constituting actual or inquiry notice are clear from the pleadings and public

disclosures, statute of limitations questions may be resolved on a motion to dismiss.  See, e.g.,

LC Capital Partners, L.P. v. Frontier Ins. Group, Inc., 318 F.3d 148, 156 (2d Cir. 2003)

(affirming dismissal of Section 10(b) claim based on statute of limitations); Dodds, 12 F.3d at

352 ("Where, as here, the facts needed for determination of when a reasonable investor of

ordinary intelligence would have been aware of the existence of fraud can be gleaned from the

complaint and papers such as the prospectuses and disclosure forms that are integral to the

complaint, resolution of the issue on a motion to dismiss is appropriate."); see also GVA Market

Neutral Master Ltd., 580 F. Supp. 2d at 327 (dismissing Exchange Act claims as time-barred)

(S.D.N.Y. 2008); Openwave, 528 F. Supp. 2d at 248 (dismissing Section 11 and 12 claims as

time-barred); Alstom, 406 F. Supp. 2d at 430 (dismissing Section 11 claims as time-barred).  In

fact, the Second Circuit has resolved the issue of notice for statute of limitations purposes on a

motion to dismiss in a "vast number of cases."  LC Capital Partners, L.P., 318 F.3d at 156

(citation omitted).  Moreover, inquiry notice is easier to establish on a motion to dismiss Section

11 and 12 claims because scienter is not an element of those claims and therefore inquiry notice arises as soon as there is public information that indicates a probability of false or misleading statements.  See Openwave, 528 F. Supp. at 246 ("Indeed, because plaintiff's Securities Act claims are not fraud-related, but rather concern strict liability and negligence for misrepresentations or misstatements by the defendants, the disclosure gave plaintiff more than adequate prompting to inquire into [the issuer defendant's] alleged wrongdoing.").

A.    **Plaintiffs Were Aware Of Alleged Facts Giving Rise To Their Claims Against The Underwriter Defendants More Than One Year Before They Filed The CAC.**

In this case, Plaintiffs were aware (or at least on inquiry notice) of alleged facts giving rise to their claims well more than one year before they filed the CAC, which named the Underwriter Defendants as defendants for the first time.  As described more fully above and in iStar's motion papers, the crux of Plaintiffs' Section 11 and 12(a)(2) claims is that defendants knew but failed to disclose three things:  (1) that iStar's held-to-maturity investments had experienced a material decline in value; (2) that there was an incremental increase in iStar's loan loss reserve; and (3) that there was an increase in the carrying value of iStar's non-performing loans and watch list assets.  (See CAC ¶¶ 47-67.)  Plaintiffs' allegations concerning misleading risk disclosures and inaccurate financial statements are nothing more than a variation on this core theme.

Taking in turn each of the three items Plaintiffs claim Defendants failed to disclose – first, as revealed by Plaintiffs' own allegations, the market knew by the time of the secondary offering of the trend that unrealized losses on iStar's debt securities were materially increasing. The market knew from iStar's own public filings that iStar was invested in debt securities, such as LNT and WCI, and that the value of these securities was declining.  (See iStar Mem. at 18.) iStar's Second Quarter 10-Q, dated August 9, 2007, referenced these investments by iStar.  (See

Davis Decl. Ex. E at 12 ("The carrying value of Other Lending Investment-Securities, as of June 30, 2007 includes $586.9 million of held-to-maturity investments with an aggregate fair value of $576.6 million and gross unrealized gains and losses of $27.2 million and $37.5 million, respectively.").) And, the disclosure in iStar's Third Quarter 10-Q, dated November 9, 2007, which Plaintiffs themselves cite, makes clear that these securities have only declined in value: "As of September 30, 2007, the carrying value of Other Lending Investment-Securities includes $586.2 million of held-to-maturity investments with an aggregate fair value of $526.9 million and gross unrealized gains and losses of $8.1 million and $67.3 million, respectively." (CAC ¶ 49; see also Davis Decl., Ex. B at 14.)

*Second*, the market knew by the time of the secondary offering that iStar likely would further increase its loan loss reserve. (See iStar Mem. at 14-16.) Both iStar's First Quarter 10-Q, which was dated May 9, 2007 and incorporated into the Registration Statement, and iStar's Second Quarter 10-Q, which was dated August 9, 2007, cited by Plaintiffs, and incorporated into the Registration Statement, made crystal clear that iStar had increased its loan loss reserve during the first half of 2007 "based on management's evaluation of general market conditions, the Company's internal risk management policies and credit risk ratings system, industry loss experience, the likelihood of delinquencies or defaults, the credit quality of the underlying collateral and changes in the size of the loan portfolio." (Davis Decl. Exs. Q and E at 11; see also Davis Decl. Ex. E at 38.) iStar's Third Quarter 10-Q, dated November 9, 2007 and also cited by Plaintiffs, identified additional increases in the company's loan loss reserve based on the same factors. (See Davis Decl. Ex. B at 13-14, 37.) That 10-Q also made clear that iStar had increased reserves during the year "primarily due to negative trends in the overall economy and growth in the portfolio." (Id. at 45-46.) And, iStar expressly stated during its Q3 2007 Earnings Call, on November 6, 2007, that it expected the trend of increasing loan loss reserve to continue.

The CFO of iStar stated: "We expect to continue to build reserves based on our quarterly assessment of the risks we believe exist in the combined portfolio." (Davis Decl. Ex. C at 3.)[6] The CFO further stated that "we do anticipate having a little heavier reserve volume in the next couple of quarters related to Fremont." (Id. at 12.)

Third, as for the claims relating to the increase in iStar's non-performing loans and watch list assets, the market also knew that these items likely would continue to increase. (See iStar Mem. at 16-18.) iStar's Second Quarter 10-Q disclosed an increase in the number and aggregate carrying value of non-performing loans as well as an increase in the aggregate carrying value of watch list assets. (Davis Decl. Ex. E at 32, 38.) iStar's Third Quarter 10-Q, dated November 9, 2007, made clear that iStar "had material increases in [its] watch list assets and non-performing loans. (See Davis Decl. Ex. B at 37.) Moreover, iStar's CFO expressly stated during its Q3 2007 Earnings Call on November 6, 2007 that two loans totaling $155 million were added to the watch list. (See Davis Decl. Ex. C at 2-3.) The CFO explained that: "As we expected, and as

---

[6] Indeed, with respect to value of debt securities, loan loss reserve, non-performing loan, and watch list asset determinations, Plaintiffs were on notice well before the secondary offering that iStar made such assessments on a quarterly basis, and therefore could not have reasonably expected iStar to update its assessments in-between quarters. (See, e.g., Davis Decl. Ex. A (iStar's March 1, 2007 10-K) at 8 ("The Company continually monitors borrowers performance and completes a detailed, loan-by-loan formal credit review on a quarterly basis."); id. at 44 ("We conduct a quarterly comprehensive credit review, resulting in an individual risk rating being assigned to each asset."); id. at 51-52 ("We assess our non-performing loans and watch list assets for individual impairment each reporting period. . . . If we determine that a loan is impaired, either a specific reserve is created or the loan, or a portion thereof, is charged-off through the allowance for loan losses."); id. at 24 ("Our quarterly operating results could fluctuate; therefore, you should not rely on past quarterly results to be indicative of our performance in future quarters."); Davis Decl. Ex. L (iStar's Q2 2007 Earnings Call Transcript) at 7 ("And we spend a lot of time each quarter walking through each asset, particularly the watch list and NPLs, to determine what we think appropriate reserves should be, and whether we need to increase the reserve level to cover those."); Davis Decl. Ex. C (iStar's Q3 2007 Earnings Call Transcript) at 3 ("The increase in [loan loss] reserves was the result of our regular quarterly risk rating review process as well as the addition of the Fremont portfolio."); CAC ¶ 65 (citing iStar's Third Quarter 2007 10-Q ("We conduct a quarterly comprehensive credit review, resulting in an individual risk rating being assigned to each asset.").)

we outlined on the July earnings conference call, following the close of the Fremont transaction, our NPL and watch list assets grew significantly with the inclusion of the Fremont assets." (Id. at 2.) And both iStar's CFO and CEO indicated that this trend would only continue. iStar's CFO stated: "We expected the NPL list to increase this quarter and expect it to increase over the next couple quarters although more modestly." (Id. at 3.) In response to a question about the Fremont transaction, iStar's CEO stated: "So there are going to be some [assets that have problems]. We're going to lose somewhere between zero and 280 million. That's our prediction, and we underwrote it to make a 20 if we lose 280 million and still comfortable with that number." (Id. at 15.)

Based on this mix of public information, Plaintiffs surely knew or were at least on inquiry notice of their claims against the Underwriter Defendants by the time of the secondary offering on or about December 14, 2007. Given iStar's disclosures, Plaintiffs should have known as soon as the issuances of the October 9, 2007 Prospectus and December 13 and 17, 2007 Prospectus Supplements, which were incorporated into the Registration Statement, occurred that they had potential claims against the Underwriter Defendants with respect to iStar. The same is true with respect to Plaintiffs' claims concerning loan loss reserves and non-performing loans and watch list assets, in light of iStar's pre-secondary offering disclosures and indications that the negative trends in those areas would continue.

Because Plaintiffs' Section 11 and Section 12 claims against the Underwriter Defendants were not filed until February 2, 2009, more than one year after the disclosure of facts underlying their allegations, those claims are time-barred as a matter of law. Courts have routinely dismissed securities claims where, as here, there was sufficient information in the public domain to at least trigger inquiry notice as a matter of law. See, e.g., Dodds, 12 F.3d at 350-51 (affirming dismissal of Section 11 and 12 claims because prospectuses and disclosure forms

placed plaintiff on inquiry notice of the commissions, risk, and illiquidity of the investments);

Alstom, 406 F. Supp. 2d at 421-29 (holding that purchasers had inquiry notice that company

concealed vendor financing agreements with certain customers when company issued

statements); Brimo, 2000 WL 1506083, at *2 (affirming dismissal of claim because

announcement of earnings shortfall and drop in stock price placed investor on inquiry notice that

prior rosy projections for company could be false); Ezra Charitable Trust v. Frontier Ins. Group,

Inc., No. 00 Civ. 5361, 2002 WL 87723, at *5-6 (S.D.N.Y. Jan. 23, 2002) (holding that investors

had inquiry notice of their securities claim that insurance reserves were understated because

company had increased reserves on two occasions).

> **B.      Plaintiffs' Claims Against The Underwriter Defendants Do Not Relate
>           Back To The Dates Of Earlier Complaints.**

Plaintiffs' filing of earlier complaints against iStar and related individuals does not

salvage their time-barred claims against the Underwriter Defendants, which were not parties to

those complaints.  The newly-added claims against the Underwriter Defendants do not relate

back to the dates of the initial complaints.  Pursuant to Rule 15(c)(1)(C) of the Federal Rules of

Civil Procedure, an amended pleading adding a party relates back to the date of the original

pleading if (1) the amendment asserts a claim or defense that arose out of the conduct,

transaction, or occurrence set out in the original pleading and (2) within the 120-day period

provided for service of the original pleading, the new party (i) received such notice of the action

that it will not be prejudiced in defending on the merits and (ii) knew or should have known that

that action would have been brought against, but for a mistake concerning the proper party's

identity. Fed. R. Civ. P. 15(c)(1)(C). Thus,"[t]here are . . . three requirements that must  be met

before an amended complaint that names  a new party can be deemed to relate back to the

original timely complaint.  First, both complaints must arise out of the same conduct, transaction

or occurrence.  Second, the additional defendant must have been omitted from the original

complaint by mistake.  Third, the additional defendant must not be prejudiced by the delay."

Alstom, 406 F. Supp. 2d at 430 (citation omitted); see also Cornwell v. Robinson, 23 F.3d 694,

705 (2d Cir. 1994) ("The requirement that a new defendant 'knew' he was not named due to a

mistake concerning identity presupposes that in fact the reason for his not being named was a

mistake in identity.")

     In Alstom, the court dismissed as untimely the plaintiffs' securities fraud claims against

a defendant who was not added to the case until after the applicable statute of limitations had

expired.  See Alstom, 406 F. Supp. 2d at 431.  The court refused to apply the "relation back"

doctrine because it "[did] not find plausible any argument that [p]laintiffs were mistaken" as to

the identity of the newly added defendant at the time of the filing of the first complaint that

raised the relevant securities fraud claims.  Id.  The court reasoned that "in light of [[p]laintiffs']

obvious knowledge" of the newly added defendant's role in the events at issue, including its role

in the secondary offering at issue, which had been disclosed in SEC filings relied on in the earlier

complaint, the omission of the newly added defendant from the earlier complaint "must be

considered a matter of choice, not mistake." Id.[7]  Like the plaintiffs in Alstom, Plaintiffs here

knew the identities of all defendants – including the Underwriter Defendants and their role in

iStar's secondary offering – at the time the initial complaints were filed in April 2008.  See Form

424B5 Prospectus filed December 17, 2007 (Davis Decl. Ex. S) at S-4 (specifically naming the

---

[7] See also In re WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d 431, 449 (S.D.N.Y. 2003)
(dismissing as untimely Section 11 claim against a group of "Additional Underwriter
Defendants" who were added to the cases sixteen months after the plaintiffs' complaint was filed
and refusing to apply the relation back doctrine because plaintiffs "are assumed to have omitted
the defendants intentionally, not by mistake" where "plaintiffs knew of the proposed defendants
and chose not to name them"), rev'd, in part, on other grounds, 496 F.3d 245 (2d Cir. 2007).  The
Second Circuit's reversal of this decision, on other grounds, does not affect its analysis on this
point.

Underwriter Defendants as underwriters of iStar's secondary offering). Plaintiffs chose not to include the Underwriter Defendants in their initial complaints. Accordingly, the CAC does not relate back to the initial complaints for statute of limitations purposes.

## II.   PLAINTIFFS FAIL TO PLEAD THE SECTION 11 AND 12 CLAIMS AGAINST THE UNDERWRITER DEFENDANTS WITH PARTICULARITY.

In addition to being time-barred, Plaintiffs' Section 11 and 12(a)(2) claims must also be dismissed because they have not been pleaded with the particularity required by Rule 9(b). Rule 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). It is well established that "while a plaintiff need allege no more than negligence to proceed under Section 11 and Section 12(a)(2), claims that do rely upon averments of fraud are subject to the test of Rule 9(b)." Rombach v. Chang, 355 F.3d 164, 171 (2d. Cir 2004). It is Rule 9(b)'s application to "all averments of fraud" that extends the rule's reach to all claims that "sound in fraud," regardless of the precise cause of action asserted. Thus, the court in Rombach applied Rule 9(b) to the precise claims at issue here – Section 11 and Section 12(a)(2) claims – even though they do not necessarily require proof of fraudulent intent, in light of the fact that "the wording and imputations of the complaint were classically associated with fraud . . ." Id. at 172.

A complaint "sounds in fraud" where it contains "wording and imputations" that "are classically associated with fraud" – for example, where it alleges that "the Registration Statement was 'inaccurate *and* misleading;' that it contained '*untrue* statements of material facts,' and that 'materially *false* and *misleading* written statements' were issued.'" Id. (emphasis in original). Here, the CAC is replete with such wording and imputations. For example, the CAC states:

- "The Registration Statement, Prospectus and Prospectus Supplements for the Secondary Offering was defective and *inaccurate*, contained *untrue statements of material facts*, omitted to state other facts necessary to make the statements made not *misleading*, and

omitted to state material facts required to be stated therein." (CAC ¶ 94 (emphasis added); and

- "The Prospectus and Prospectus Supplements contained *untrue statements of material fact*, [and] omitted to state other facts necessary to make the statements made not *misleading*." (CAC ¶ 104 (emphasis added)).

And the CAC does not stop there. It affirmatively asserts – that "defendants" – including the Underwriter Defendants – knew the allegedly undisclosed facts but failed to reveal them:

- "defendants knew that iStar's held-to-maturity investments had experienced a material decline in the [sic] value between September 30, 2007 and the time of the Secondary Offering" (CAC ¶ 52);

- "defendants knew that iStar's loan portfolio had experienced material decline in value between September 30, 2007 and the time of the Secondary Offering" (CAC ¶ 60); and

- defendants knew that between September 30, 2007 and the time of the Secondary Offering . . . the credit quality of iStar's loan portfolio declined precipitously causing a sharp spike in the Company's NPLs and watch list assets by the time of the Secondary Offering" (CAC ¶ 67).

These allegations reveal that despite Plaintiffs' attempt to cabin their fraud claims by alleging that the Registration Statement was "negligent" and separating their Exchange Act allegations, Plaintiffs paint the Underwriter Defendants with the same brush as the other defendants in terms of knowledge and intention. Plaintiffs' allegations that all defendants "knew" the allegedly undisclosed facts are a classic imputation of fraud. See Ladmen Partners, Inc. v. Globalstar, Inc., 07 Civ. 0976, 2008 U.S. Dist. LEXIS 76670, at *35-36 (S.D.N.Y. Sept. 30, 2008) ("While the CSAC also includes allegations couched in terms of negligence, the underlying theory regarding the Individual Defendants is the same as it is with respect to Globalstar, namely that they *knew* that the Company's satellites were failing and participated in an essentially fraudulent scheme to deceive investors about the true status of assets.") (emphasis in original). Plaintiffs cannot allude to fraud throughout the CAC and then escape Rule 9(b) with respect to their Securities Act claims. See Miller v. Lazard, Ltd., 473 F. Supp. 2d 571, 585

(S.D.N.Y. 2007) ("'Plaintiffs cannot so facilely put the fraud genie back in the bottle'") (citation

omitted). Because the factual basis of Plaintiffs' Section 11 and 12 claims against the

Underwriter Defendants is predicated upon the same knowing conduct of all defendants, those

claims sound in fraud and accordingly Rule 9(b) applies. See Ladmen Partners, Inc., 2008 U.S.

Dist. LEXIS 76670, at *37-38 ("allegations of knowing and deliberate misrepresentations

fundamentally sound in fraud").[8]

   When Section 11 and/or 12(a)(2) claims sound in fraud – as they do here – a plaintiff

must, in order to satisfy the Rule 9(b) standard, "(1) specify the statements [it] contends were

fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4)

explain why the statements were fraudulent." Id. at *31. In order to satisfy the fourth prong (the

"why"), a plaintiff must "allege facts giving rise to a strong inference of fraudulent intent." See

Chill v. Gen. Elec. Co., 101 F.3d 263, 267 (2d Cir. 1996) (citation omitted); Rombach, 355 F. 3d

at 176. Further, "[w]hen, as in this case, a complaint is made against multiple defendants, the

pleading must give notice to each defendant of its alleged misconduct." In re Blech Sec. Litig.,

961 F. Supp. 569, 580 (S.D.N.Y. 1997) (applying Rule 9(b) to Exchange Act and common law

fraud claims) (emphasis in original).

   Plaintiffs' Section 11 and 12(a)(2) allegations against the Underwriter Defendants here

fall woefully short of satisfying the standard established by Rule 9(b). Plaintiffs have not even

identified the alleged fraudulent statements in the secondary offering materials with the requisite

---

[8] Hoping to circumvent the requirements of Rule 9(b), "[f]or purposes of [their Securities Act
Counts], Plaintiffs affirmatively state that they do not claim that Defendants committed
intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent."
(CAC ¶¶ 92, 102.) It is well-established, however, that the insertion of a simple disclaimer of
fraud does not preclude the application of Rule 9(b) to claims that sound in fraud. See, e.g.,
Rombach, 355 F.3d at 172 (citation omitted); In re Marsh & McLennan Cos. Sec. Litig., 501 F.
Supp. 2d 452, 492 (S.D.N.Y. 2006).

particularity, let alone explain why they were fraudulent.  Plaintiffs' pleading deficiencies are all the more so with respect to the Underwriter Defendants.  The CAC's only allegations mentioning the Underwriter Defendants do no more than recite the standard and typical role of underwriters in a public offering.  The CAC does not contain a single factual allegation regarding any actions taken by the Underwriter Defendants in connection with the alleged misstatements, let alone any facts that give rise to a strong inference of fraudulent intent on the part of any particular Underwriter Defendant or any employee of any Underwriter Defendant (none of whom is named).  See Rey-Willis v. Citibank, N.A., No. 03 Civ. 2006, 2004 WL 315267, at *2 (S.D.N.Y. Sept. 17, 2004) (dismissing complaint for failure to plead with particularity as required under Rule 9(b) where it alleged conversations with employees of a corporate defendant, but "failed to identify, by name or otherwise, the identity of the persons who engaged in fraudulent activity"); see also Borsellino v. Goldman Sachs Group, Inc., 477 F.3d 502, 508-11 (7th Cir. 2007) (dismissing complaint for failure to comply with Rule 9(b) because "plaintiffs have offered none of the critical details regarding the alleged fraud" of the defendant).  Plaintiffs simply clump the Underwriter Defendants together with the other defendants, and contend in a conclusory fashion that all defendants knew the undisclosed facts and that the Underwriter Defendants prepared and disseminated the purportedly defective and inaccurate Prospectus and Prospectus Supplements for their own financial benefit.  (CAC ¶¶ 52, 60, 67, 107.)

Moreover, Plaintiffs fail to assert any factual allegations particularized to specific Underwriter Defendants, let alone to specific individuals within them.  Such allegations simply do not satisfy Rule 9(b) and courts have dismissed them under similar circumstances.  See, e.g., Ladmen Partners, Inc., 2008 U.S. Dist. LEXIS 76670, at *37-38 (dismissing Section 11 and 12(a)(2) claims against underwriter defendants where the complaint failed to distinguish them from the issuer and individual defendants in allegations of essentially fraudulent conduct); Caiafa

v. Sea Containers Ltd., 525 F. Supp. 2d 398, 408 (S.D.N.Y. 2007) (dismissing Section 11 claim because it sounded in fraud and failed to specify any specific statements alleged to be misleading); In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005) (dismissing Section 11 claim because plaintiffs failed to plead with particularity a strong inference of scienter in connection with a material misrepresentation or omission); see also In re Blech Sec. Litig., 961 F. Supp. at 580 ("Rule 9(b) is not satisfied by a complaint in which 'defendants are clumped together in vague allegations'") (citation omitted); Scone Invs., L.P. v. American Third Market Corp., 97 Civ. 3802, 1998 U.S. Dist. LEXIS 5903, at *12 (S.D.N.Y. Apr. 27, 1998) ("Courts are especially vigilant in applying Rule 9(b) where a complaint is made against multiple defendants.  Each defendant is 'entitled to be apprised of the circumstances surrounding the fraudulent conduct with which it individually stands charged.'") (quoting In re Blech Sec. Litig.).

## CONCLUSION

For all of the foregoing reasons, as well as the reasons incorporated herein by reference, the Underwriter Defendants' motion to dismiss the CAC with prejudice should be granted.

Dated: New York, New York
         April 27, 2009

SIDLEY AUSTIN LLP

By: /s/ A. Robert Pietrzak
    A. Robert Pietrzak
    Dorothy J. Spenner
    Vikeena K. Bonett
    787 Seventh Avenue
    New York, New York 10019
    Telephone: (212) 839-5300
    Facsimile:  (212) 839-5599

*Attorneys for Defendants Citigroup Global Markets Inc., J.P. Morgan Securities Inc., Wachovia Capital Markets, LLC, Banc of America Securities LLC, Deutsche Bank Securities Inc., and UBS Securities LLC*