UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————

No. 08 Civ. 3612 (RJS)

———————————

CITILINE HOLDINGS, INC.,
individually and on behalf of all others similarly situated,

Plaintiff,

VERSUS

ISTAR FINANCIAL INC., ET AL.,

Defendants.

———————————

MEMORANDUM AND ORDER
March 26, 2010

———————————

RICHARD J. SULLIVAN, District Judge:

   Plaintiffs bring this putative class action against Defendants iStar Financial, Inc., several of its officers and directors, and the underwriters of its 2007 secondary offering. Now before the Court are Defendants' motions to dismiss the Consolidated Amended Complaint (the "CAC"). For the reasons that follow, the motions are DENIED except as to (1) the liability of the individual defendants under Section 12(a)(2) of the Securities Act and (2) the liability of Defendant Timothy J. O'Conner under Section 11 of the Securities Act.

I.   BACKGROUND

A.   Facts

   The following facts are taken from the CAC. The Court also considers any written instrument attached to the CAC, statements or documents incorporated into the CAC by reference, legally required public disclosure documents filed with the Securities and Exchange Commission ("SEC"), and documents upon which Plaintiff relied in bringing suit. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007).

### 1. Defendants

iStar is a real estate investment trust; its business consists primarily of making senior and mezzanine loans on commercial real estate. (CAC ¶ 20.) On July 2, 2007, it acquired the $6.27 billion commercial real estate portfolio and commercial real estate lending business of Fremont Investment and Loan. (*Id.* ¶ 24.) At all times relevant to this action, Defendant Jay Sugarman was chairman of iStar's board of directors and its chief executive officer, Defendant Nicholas A. Radesca was iStar's chief accounting officer, Defendant Catherine D. Rice was iStar's chief financial officer, and Defendant Timothy J. O'Conner was iStar's chief operating officer and executive vice president. (*Id.* ¶¶ 8-11.)

Defendants Citigroup Global Markets Inc., J.P. Morgan Securities Inc., Wachovia Capital Markets, LLC, Banc of America Securities LLC, Deutsche Bank Securities Inc., and UBS Securities LLC are investment banks that served as underwriters of the secondary offering described below. (*Id.* ¶ 13.)

### 2. The Investor Conference

On December 6, 2007, iStar held its Investors Day Conference at the New York Public Library. (*Id.* ¶ 29.) At the conference, iStar executives made numerous comments, many of which Plaintiffs allege were false and misleading.

According to the CAC, Sugarman touted iStar's "balance sheet strength" and the "strength of [its] business model." (*Id.* ¶ 32.) He further indicated that iStar's loans were "collateralized by high-quality assets" and that its debt was "extremely well protected." (*Id.*) He also stated that iStar's business was comparatively safe because the company focused on whole commercial loans, rather than residential loans or structured products. (*Id.*)

O'Conner explained that iStar "understand[s] what's going on in our portfolio on a real-time basis." (*Id.* ¶ 33.) He stated that the company's average "loan to value" ratio was 67%, creating a "33% cushion between our last dollar of exposure and the value of the underlying collateral." (*Id.*) Thus, O'Conner explained, there was "a lot of room for things to go wrong and for us to still be okay" and "a nice cushion for th[e] portfolio." (*Id.*) O'Conner noted that iStar had 135 employees focused on risk management, and "all they do from the time they get up to the time they leave work is watch our portfolio and watch our assets." (*Id.* ¶ 34.) O'Conner further stated that the iStar portfolio was "performing pretty much as expected," despite the deterioration in the real estate market, as it did not have "a lot of exposure to" some of the most depressed regions in the country. (*Id.* ¶ 35.) He explained that iStar had some "$125 million or 124-ish million of on-balance sheet reserves" and that iStar's "cushion" was "significantly greater than it was a year ago." (*Id.*)

Lastly, Rice indicated that iStar had "announced 2008 adjusted earnings guidance of $4.00 to $4.20," and that it had "announced a 5% increase to [its] quarterly dividend." (*Id.* ¶ 37.) She also stated that iStar would declare a special dividend in 2007 of between $0.15 and $0.30 per share, "due to the increase in income that we're receiving from the Fremont portfolio." (*Id.*)

### 3. The Secondary Offering

On May 1, 2007, iStar filed a registration statement with the SEC offering to sell securities to the public. (*Id.* ¶ 39.)

On October 9, 2007, it filed the prospectus, which forms part of the registration statement. (*Id.* ¶ 40). On December 13, 2007, less than a week after the investor conference, iStar filed a prospectus supplement offering to sell six million common shares to the public. (*Id.* ¶ 41.) On or about December 14, 2007, the registration statement became effective, and at least six million shares of common stock were sold to the public at $28.41 per share. (*Id.* ¶ 41.) On December 17, 2007, iStar amended the prospectus supplement to sell an additional two million shares to the public. (*Id.*)

### 4. Post-Offering Disclosures

On February 28, 2008, iStar announced its fourth-quarter and year-end results for 2007, disclosing that its financial results were impacted by $134.9 million of charges associated with the impairment of two credits and a $113 million increase in its loan loss provisions. (*Id.* ¶ 83.) These two charges erased nearly 90% of iStar's earnings from the first three quarters of the year. (*Id.*) iStar also disclosed that during the fourth quarter, the number of non-performing loans increased by more than 65%, and watch list assets increased by more than 100%. (*Id.*)

The value of iStar common stock declined to half of what it had sold for in the secondary offering, and analysts downgraded their opinion of the company. (*Id.* ¶¶ 85-89.)

### B. Procedural History

The initial complaint in this action was filed on April 15, 2008, and the action was assigned to the Honorable Robert W. Sweet, District Judge. On April 24, 2008, the complaint in *Christenson v. iStar Financial, Inc.*, No. 08 Civ. 3879, was filed; it was accepted by Judge Sweet as a related case on April 30, 2008. On November 17, 2008, Judge Sweet granted the motion of Institutional Investor Plumbers' Union Local No. 12 Pension Fund and Citiline Holdings, Inc., for consolidation, appointment as lead plaintiffs, and approval of selection of lead counsel.

Lead Plaintiffs filed the CAC on February 2, 2009; this was the first complaint to name the underwriters as Defendants. On April 23, 2009, the consolidated case was reassigned to the Honorable Richard M. Berman, District Judge. On April 27, 2009, both the underwriters and the iStar defendants filed motions to dismiss the CAC. The action was reassigned to the docket of the undersigned on May 4, 2009, and the motions were fully submitted on August 20, 2009. The Court held oral argument on the motions on March 23, 2010.

## II. DISCUSSION

### A. Standing

As an initial matter, Defendants argue that Plaintiffs have failed to sufficiently plead that they "purchase[d] securities that are the direct subject of the prospectus and registration statement," (iStar Mem. at 8 (quoting *Barnes v. Osofsky*, 373 F.2d 269, 273 (2d Cir. 1967))), as is required for Section 11 standing. They are mistaken. The CAC alleges that Plaintiffs "purchased shares of iStar common stock directly in the Secondary Offering" (CAC ¶ 93), and this allegation suffices at this stage in the litigation. *See Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 407 (S.D.N.Y. 2007) ("The pleading requirement for Section 11 standing is satisfied by general allegations that plaintiff purchased pursuant to or traceable to a false registration

statement." (internal quotation marks and alterations omitted)); *In re Authentidate Holding Corp.*, 05 Civ. 5323 (LTS) (DFE), 2006 WL 2034644, at *7 (S.D.N.Y. July 14, 2006) ("[P]laintiffs are not required to explain how their shares can be traced . . . ." (internal quotation marks omitted)).

Defendants also argue that Plaintiffs have failed to sufficiently plead that they "purchased their shares directly in the . . . offering, and not the so-called 'aftermarket,'" *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 445 (S.D.N.Y. 2009), as is required for Section 12(a)(2) standing. Defendants are again mistaken. *See In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 423 (S.D.N.Y. 2003) ("The standing of [Plaintiffs] to bring these [Section 12(a)(2)] claims as representatives of those members of the class that purchased in the two Offerings is sufficiently pleaded by, among other things, the allegations that these two named plaintiffs purchased WorldCom debt securities in the two offerings . . . ."). Accordingly, the Court finds that Plaintiffs have sufficiently alleged standing to bring their Securities Act claims.

B.  iStar Entities as Sellers of Securities

Section 12(a)(2) of the Securities Act imposes liability upon any person who "sells" securities.  15 U.S.C. § 77*l*(a)(2). The iStar defendants argue that because the securities at issue were sold through a firm commitment underwriting, in which title passed to the underwriters before passing to the ultimate purchasers, the iStar defendants are not statutory sellers.

With respect to iStar itself, this argument is foreclosed by SEC Rule 159A, which provides that an issuer is a statutory seller for the purposes of Section 12(a)(2) regardless of the form of underwriting. *See* 17 C.F.R. § 239.159A.  The individual defendants, however, are statutory sellers only if they (1) directly passed title to the securities, or (2) solicited the purchase of securities out of a desire to (a) serve their own interests or (b) serve the interests of the securities' owner. *See Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988).

Although the CAC is largely silent as to the role played by the individual defendants in the solicitation of the securities at issue, Plaintiffs contend that the individual defendants' signing of the registration statement itself constitutes solicitation — as, indeed, courts in this district have frequently held. *See, e.g.*, *Briarwood Invs., Inc. v. Care Inv. Trust, Inc.*, No. 07 Civ. 8159 (LLS), 2009 WL 536517, at *4 (S.D.N.Y. Mar. 4, 2009); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 454 (S.D.N.Y. 2005); *Steed Finance LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058 (NRB), 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001).  Every Court of Appeals to have considered the issue, however, has held that an individual's signing a registration statement does not itself suffice as solicitation under Section 12(a)(2).  *See Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1216 (1st Cir. 1996); *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 636 (3d Cir. 1989).  The Second Circuit does not appear to have directly addressed the issue.

The Court is persuaded that the decisions of the Courts of Appeals better reflect both the statutory scheme and the Supreme Court's decision in *Pinter.*  While Section 11 expressly imposes liability upon every signer of the registration statement, Section 12 does not do so.  Plaintiffs' position would render this distinction a nullity and is, in any event, inconsistent with *Pinter*'s statement

4

that Congress did not intend to impose liability under Section 12 "for mere participation in unlawful sales transactions." *Pinter*, 486 U.S. at 650. At oral argument, counsel for Plaintiffs all but conceded that the CAC failed to allege facts sufficient to overcome this threshold. Accordingly, the Section 12(a)(2) claims against the individual defendants are dismissed.[1]

### C. Pleading Standard

The parties agree that Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA") apply to Plaintiffs' Exchange Act claims and that the PSLRA does not apply to Plaintiffs' Securities Act claims. They disagree, however, with respect to whether Rule 9(b) applies to Plaintiffs' Securities Act claims. As explained below, the Court holds that Plaintiffs' Securities Act claims against the iStar defendants are governed by Rule 9(b), but that Plaintiffs' Securities Act claims against the underwriters are not.

A Securities Act claim is governed by Rule 9(b) when it "sounds in fraud." *Rombach v. Chang*, 355 F.3d 164, 166 (2d Cir. 2004). Here, Plaintiffs allege that at the investor conference held on December 6, 2007, the iStar defendants "knowingly engaged in or consciously ignored the fraud alleged herein to provide [iStar] with ready access to much needed capital" (CAC ¶ 140) and "knowingly engaged in or consciously ignored the fraud alleged herein because they were troubled about ratings downgrades" (*id.* ¶ 140).

Although Plaintiffs attempt to disclaim fraud in connection with the registration statement — which became effective only eight days after the investor conference — Plaintiffs cannot simultaneously allege that Defendants were seeking to perpetrate a massive fraud at the investor conference and contend that any omissions from the registration statement were the result of something other than fraud. *See In re Refco Sec. Litig.*, 503 F. Supp. 2d 611, 633 (S.D.N.Y. 2007) ("Of course, plaintiffs cannot evade the Rule 9(b) strictures by summarily disclaiming any reliance on a theory of fraud or recklessness." (internal quotation marks and alteration omitted)); *Ladmen Partners, Inc. v. Globalstar, Inc.*, No. 07 Civ. 0976 (LAP), 2008 WL 4449280, at *12 (S.D.N.Y. Sept. 30, 2008) ("While the CSAC also includes allegations couched in terms of negligence, the underlying theory regarding the Individual Defendants is the same as it is with respect to Globalstar, namely that they *knew* that the Company's satellites were failing and participated in an essentially fraudulent scheme to deceive investors about the true status of its assets." (footnote omitted)). Accordingly, the Court concludes that the allegations against the iStar defendants sound in fraud and are governed by the heightened pleading requirements of Rule 9(b).

While the CAC is replete with allegations of fraud against the iStar defendants, however, it does not levy such charges at the underwriters. Although the iStar defendants are alleged to have committed intentional fraud, the underwriters are alleged only to have failed to disclose facts that they knew. (*See, e.g*, CAC ¶¶ 52-53, 60, 67). As this Court has previously written, "that a fact was known and not disclosed does not mean, as a matter of law, that the circumstances of the resulting omission sound in fraud." *In re Orion Sec. Litig.*, No. 08 Civ. 1328 (RJS),

---

[1] The Section 11 claim against Defendant O'Conner is also dismissed, as Plaintiffs have withdrawn that claim. (*See* Pls.' iStar Opp'n at 8 n.6.)

2009 WL 2601952, at *1 (S.D.N.Y. Aug. 20, 2009). Because the CAC carefully avoids allegations that the underwriters sought to hide unpleasant facts from the market in order to render the offering more successful, the Court concludes that the allegations against the underwriters sound in negligence and are not governed by Rule 9(b). *Cf. Rombach*, 355 F.3d at 171-72 (also holding that the claims against the issuer defendants sounded in fraud while the claims against the underwriter defendants sounded in negligence).

### D. Substantive Liability Under the Securities Act and the Exchange Act

#### 1. Securities Act

Plaintiffs allege that the registration statement failed to disclose several important changes to iStar between the end of the third quarter of 2007, when it issued a 10-Q report, and the time of the secondary offering. The purported omissions included the following:

(1) By the time of the secondary offering, iStar had suffered additional losses of $60 million on its held-to-maturity investments. (*Id.* ¶ 50.)

(2) By the time of the secondary offering, iStar was suffering additional losses in its loan portfolio, such that it would need to record a $113 million charge associated with an increase in its loan loss reserves at the end of the quarter. (*Id.* ¶ 62.)

(3) By the time of the secondary offering, the carrying value of iStar's non-performing loans had increased by more than 50%, and the carrying value of its watch list assets had increased by approximately 100%. (*Id.* ¶ 66.)

Plaintiffs claim that these nondisclosures violated Regulations S-K and S-X, both of which govern the preparation of registration statements. Item 303 of Regulation S-K requires the issuer to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). Item 503 of Regulation S-K requires an issuer to include "a discussion of the most significant risk factors that make the offering risky or speculative." *Id.* § 229.503. Finally, Regulation S-X requires "disclosure . . . where events subsequent to the end of the most recent fiscal year have occurred which have a material impact on the registrant." *Id.* § 210.01(a)(5). It further provides that financial statements filed with the SEC must conform to Generally Accepted Accounting Principles or be presumed false and misleading. *See id.* § 210.4-01(a)(1).

Defendants contend that because trends of deteriorating financial performance had been disclosed to the market and because the market readily appreciated these trends, Defendants satisfied their disclosure obligations. After discovery, Defendants may be proven correct that the information provided to the market outside the registration statement rendered the nondisclosures in the registration statement immaterial. Nevertheless, the Court is unable to reach this conclusion, as a matter of law, on a motion to dismiss. *See Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 614 (S.D.N.Y. 2008) ("[C]ourts do not grant motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) on

6

grounds of immateriality, unless the misstatements are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." (internal quotation marks omitted)).

Specifically, the Court cannot grant dismissal on the ground that the quarterly reports preceding the secondary offering put the market on notice of a trend of deteriorating performance. While the data cited by Defendants show worsening conditions over a period of perhaps a few quarters, these isolated data points do not demonstrate a trend of continuing losses sufficient to relieve Defendants of their disclosure obligations in the registration statement. *Cf. In Re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 325 (S.D.N.Y. 2009) ("This Court cannot rule that the scattered disclosures in various amendments, annexes and exhibits to the Prospectus and Registration Statement were sufficient as a matter of law to disclose the material facts to reasonable investors."); *In re Alstom SA Litig.*, 406 F. Supp. 2d 433, 453 n.11 ("An investor should not be called upon to piece together buried information from distinct parts of financial statements in order to understand basic aspects of a company's finances.").

Similarly, the Court is not persuaded that statements made in Defendants' earnings calls were sufficient to warn the market of iStar's deteriorating performance. As Defendants have argued, they did state that they "expect to continue to build reserves" (Defs.' Ex. C at 3) and that they "expected [the NPLs] to increase over the next couple of quarters although more modestly" (*id.* at 2-3). Nevertheless, the Court cannot conclude that these statements — which were not incorporated into the registration statement — were sufficient to render the omissions in iStar's registration statement immaterial as a matter of law.

Finally, the Court is not persuaded that the analyst reports issued following the release of iStar's third-quarter 2007 10-Q demonstrate that the market fully appreciated iStar's financial trajectory, such that iStar had no duty to disclose additional data prior to the 2007 offering. While these analyst reports certainly reflect some concern about iStar's deteriorating performance, they clearly did not anticipate the scale of the negative results that iStar would experience in its fourth quarter. Indeed, had the market truly been on notice of the precipitous losses that iStar was suffering, it is doubtful that iStar's share price would have declined so dramatically following the release of the 2007 10-K, as Plaintiffs allege that it did. (*See* CAC ¶¶ 85-89.) The Court is thus unable to hold that there was sufficient information in the marketplace to render iStar's nondisclosures in the registration statement immaterial as a matter of law.[2]

In light of the foregoing discussion, the Court is persuaded that the CAC satisfies the heightened pleading requirements of Rule 9(b). Specifically, the CAC alleges (1) what statements or omissions were fraudulent, (2) who made the statements or omissions, (3) the location and timing of the statements or omissions, and (4) why the statements or omissions were fraudulent. *See Rombach*, 355 F.3d at 170. Plaintiffs' allegations may eventually be proven incorrect as a factual

---

[2] Given the Court's determination that Plaintiffs have stated claims under Items 303 and 503 of Regulation S-K, it need not determine at this time whether they have also stated claims under Regulation S-X. Plaintiffs have stated Securities Act claims; the Court can evaluate the exact parameters of those claims following discovery, either in connection with a motion for summary judgment or in advance of trial.

matter, but the allegations are sufficient to survive the instant motion.

### 2. Exchange Act

Rule 10b-5, promulgated under Section 10(b) of the Exchange Act, provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. Defendants argue that the Exchange Act claims must be dismissed on two principal grounds: (1) the absence of a material misstatement or omission at the investor conference, and (2) even assuming the existence of such a misstatement or omission, the absence of scienter. Both arguments are insufficient to support Defendants' motion to dismiss.

First, Plaintiffs have adequately alleged the existence of a false or misleading statement. While the Exchange Act does not impose independent duties to speak, it does require speech where its absence would render other statements false or misleading. *See, e.g.*, *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 159-60 (S.D.N.Y. 2008). In this case, the CAC alleges that the Defendants stated, *inter alia*, (1) that iStar's debt was "extremely well protected," (CAC ¶ 32), (2) that the portfolio had "a lot of room for things to go wrong and for us to still be okay" (*id.* ¶ 33), (3) that the portfolio was "performing pretty much as expected" (*id.* ¶ 35), and (4) that iStar anticipated 2008 earnings of $4.00 to $4.20 per share (*id.* ¶ 37). Plaintiffs have alleged that these statements were all materially false or misleading, in that Defendants knew, when the statements were made, that the portfolio was suffering serious losses and generally performing far worse than expected. The Court finds that these accusations sufficiently allege the existence of a false or misleading statement.

Plaintiffs have also adequately pleaded scienter. In the Second Circuit, a plaintiff may demonstrate scienter by either (1) alleging facts showing that defendants had both motive and opportunity to commit fraud, or (2) alleging facts that constitute strong circumstantial evidence of misbehavior or recklessness. *See Janel World Trade, Ltd. v. World Logistics Servs., Inc.*, No. 08 Civ. 1327 (RJS), 2009 WL 735072, at *6 (S.D.N.Y. Mar. 20, 2009). In this case, Plaintiffs have sufficiently alleged facts constituting strong circumstantial evidence of misbehavior or recklessness. Specifically, Defendants are alleged to have told the investing public that they monitored the value of their portfolio on a nearly real-time basis; the CAC further alleges that Defendants needed to conceal iStar's deteriorating performance so that the Company would be able to secure financing and maintain an investment-grade credit rating. Combined with the fact that the Investors Day conference began with only sixteen business days remaining in the fourth quarter, these allegations of knowledge, opportunity, and motive suffice to allege scienter at this stage of the litigation.[3]

---

[3] The Court's unwillingness to dismiss the Exchange Act claims on scienter grounds is bolstered by the fact that Plaintiffs have adequately stated Securities Act claims. Because discovery will be going forward in any case, a fact finder will be in a far better position to determine if Defendants acted with fraudulent intent following the close of discovery than the Court would be solely on the basis of the pleadings.

8

### E. Control Person Liability

The iStar defendants also contend that the CAC fails to sufficiently plead control person claims under Section 20 of the Exchange Act and Section 15 of the Securities Act. The Court holds that the CAC amply states control person claims.

To state a claim for control person liability under Section 20 of the Exchange Act, "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns*, 493 F.3d at 108. Defendants contend that the CAC fails to satisfy the third element, insofar as it does not plead that each individual defendant acted with the requisite culpable state of mind. This argument is unavailing, for the CAC specifically pleads facts sufficient to show that the individual defendants "knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public." (CAC ¶ 134.)

To state a claim for control person liability under Section 15 of the Securities Act, a plaintiff must allege "(a) a primary violation by a controlled person, and (b) control by the defendant of the primary violator." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d at 637. The iStar defendants contend that the CAC fails to adequately plead the second element, as "[o]fficer or director status alone does not constitute control," *In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194, 221 (S.D.N.Y. 1999). The CAC, however, alleges more than the individual defendants' status; it specifically alleges that they "had the power to influence and exercised the same to cause iStar to engage in the conduct complained of herein" (CAC ¶ 114). Because "whether a person is a controlling person is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss," *In re Scottish Group Sec. Litig.*, 524 F. Supp. 2d 370, 401 (S.D.N.Y. 2007) (internal quotation marks and alterations omitted), the Court is not persuaded that dismissal on this ground would be appropriate at this stage in the litigation.

### F. Underwriters' Motion

In addition to the arguments addressed above, the underwriters seek dismissal on the grounds that (1) the claims against them are untimely, and (2) Plaintiffs have failed to state a claim against them. The Court finds both arguments unavailing.

#### 1. Statute of Limitations

Claims alleging violations of the Securities Act must be brought within one year of their accrual. *See* 15 U.S.C. § 77m. The underwriters' essential contention is that, as of the date of the secondary offering, it was apparent from iStar's previous public filings that its performance was deteriorating, such that Plaintiffs were on at least constructive notice of potential claims from the moment that they purchased their shares. Thus, Defendants argue, the statute of limitations began to run immediately after the secondary offering.

This argument is another form of the principal argument made by the iStar defendants — i.e., that there was sufficient information in the marketplace such that the registration statement was not false and misleading and that Plaintiffs should have known of iStar's financial problems and brought suit immediately after purchasing their shares. Yet as the Court has already

9

held in denying the iStar motion, a fact finder could reasonably conclude that the pre-offering disclosures did *not* put the market on notice of the extent of iStar's financial problems — and that it was not until the issuance of the 2007 10-K that the nature of iStar's financial problems became clear. Because the CAC was filed within one year of that date, the claims against the underwriters are timely.

### 2. Failure To State a Claim

The underwriters also argue that the CAC fails to satisfy the heightened pleading requirements of Rule 9(b). As the Court has already concluded, however, the claims against the underwriters do not sound in fraud and are not governed by Rule 9(b); they therefore need only meet the notice requirements of Rule 8(a). The CAC meets this threshold, as it repeatedly alleges the underwriters' failure to disclose known, material facts that they had a duty to disclose. (*See* CAC ¶¶ 52-53, 60, 67, 97)

### III. CONCLUSION

For the reasons stated above, Defendants' motions to dismiss are DENIED, except as to (1) the liability of the individual defendants under Section 12(a)(2) of the Securities Act, and (2) the liability of Defendant O'Conner under Section 11 of the Securities Act.

The parties ARE HEREBY ORDERED to meet and confer, and to submit a proposed case management plan no later than April 19, 2010. A template for the case management plan is available at http://www1.nysd.uscourts.gov/judge_info.php?id=99, and it should be e-mailed to sullivannysdchambers@nyds.uscourts.gov.

The Clerk of the Court is respectfully directed to terminate the motions located at Doc. Nos. 43 and 45.

SO ORDERED.

_____
RICHARD J. SULLIVAN
United States District Judge

Dated: March 26, 2010
       New York, New York

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/26/10